STATE

v.

Jose DEARMAS.

No. 2002–189–M.P.

Supreme Court of Rhode Island.

Feb. 13, 2004.

Aaron L. Weisman, Providence, for Plaintiff.

Paula Lynch, for Defendant.

Present: WILLIAMS, C.J., FLANDERS, GOLDBERG, FLAHERTY, and SUTTELL, JJ.

## OPINION

FLANDERS, Justice.

We review here a Superior Court order granting the state's motion to seize a blood sample from the petitioner, Jose Dearmas, as well as a search warrant issued by that same court to the same effect. The petitioner is a defendant in a pending criminal case charging him with two counts of first-degree child molestation. The state requested and obtained the blood-seizure order and search warrant because it sought to conduct tests on the petitioner's blood to ascertain whether the petitioner's DNA matched the DNA obtained from body-fluid evidence that the perpetrator left at the crime scene after he molested the victim. In asking us to quash the blood-seizure order and search warrant, the petitioner argues that the Superior Court exceeded its authority in granting the motion and issuing the warrant because a blood sample does not constitute "property" as that term is used in G.L. 1956 § 12-5-2, the statute that defines the grounds upon which trial-court judges may issue search

warrants for the seizure of certain types of evidence. For the reasons set forth below, we agree with the petitioner and hold that blood seized from an unconsenting person does not constitute "property" as that term is used in § 12–5–2. Accordingly, we reverse, quash the blood-seizure order and the warrant, and remand this case to the Superior Court for further proceedings consistent with this opinion.

## Facts and Travel

On August 27, 2001, a grand jury indicted petitioner, charging him with two counts of first-degree child molestation.[1] The Superior Court arraigned petitioner and he pled not guilty. Thereafter, on January 29, 2002, the state asked the Providence County Superior Court to issue an order "granting the seizure of blood" from petitioner. The petitioner objected to this request, and the court held a hearing on the state's motion. At the conclusion of the hearing, the Superior Court granted the state's request, issued a blood-seizure order, and instructed the state to apply for the issuance of a search warrant. After the state did so, the court issued the warrant, but stayed its execution pending our review of the legality of the order and

warrant. On March 26, 2002, a duty justice of this Court stayed the Superior Court blood-seizure order. Thereafter, on March 28, 2002, this Court issued an order granting the petition for a writ of certiorari and continued the stay until further order of this Court.

## Analysis

■ The narrow question before us today is whether the Superior Court exceeded its jurisdiction under § 12–5–2 by issuing an order granting the state's motion to seize a sample of petitioner's blood, authorizing the state to apply for a search warrant to effectuate this seizure, and then issuing a search warrant for the police to seize a vial of petitioner's blood. In *State v. DiStefano*, 764 A.2d 1156 (R.I.2000), a majority of this Court noted that "the Superior Court is statutory in origin and derives its powers from statutes duly enacted by the Legislature." *Id.* at 1167–68, 1168 n. 27 (quoting R.I. Const. art. 10, sec. 2, which provides: "The inferior courts shall have such jurisdiction as may, from time to time, be prescribed by law."). Thus, the Superior Court does not possess any inherent authority to issue blood-sei-

1. The grand jury also indicted the petitioner's codefendant, Christopher Morales, and likewise charged him with two counts of first-degree child molestation. Both defendants petitioned this Court for a writ of certiorari. Because the petitions presented the same issue—namely, whether the Superior Court possessed the authority to issue a blood-seizure order and search warrant authorizing the police to seize a sample of defendants' blood—we also granted Morales's petition and consolidated the cases for briefing and argument. Although our opinion speaks only in terms of petitioner Dearmas, what we say here applies equally to petitioner Morales.

In addition, a related issue arose in a different criminal case, *State v. Feliciano*, (22–2003–00399), now pending in the Second Division District Court in Newport. On March 28, 2003, we granted that defendant's petition

for a writ of certiorari and stayed proceedings in his District Court case pending the outcome of this case. That stay shall continue until we rule separately on that case, which raises the issue of whether a court order authorizing the police to seize blood should be treated differently when it is not coupled with the issuance of a warrant to seize a blood sample from the defendant.

After oral arguments in this case, the state filed a post-argument memorandum stating that the *Feliciano* case did not actually involve the issue we are addressing today because the District Court only issued a court order, not a search warrant, to secure a sample of Feliciano's blood. Whether that difference calls for a different result we leave for decision in that case or in another one raising that issue.

zure orders or to authorize the use of search warrants to accomplish such seizures; instead, it may exercise only those powers that the General Assembly has granted to it. *See DiStefano*, 764 A.2d at 1168 (citing *Kass v. Retirement Board of the Employees' Retirement System*, 567 A.2d 358, 361 (R.I.1989)).

Section 12–5–1(a) and G.L. 1956 § 8–3–6 vest the justices of the District and Superior Courts with the authority to issue search warrants.[2] Section 12–5–2[3] provides, in pertinent part, that a warrant may issue "to search for and seize any property * * * (4) [w]hich is evidence of the commission of a crime." Therefore, § 12–5–2 expressly limited the trial justice's authority in this case to issue search warrants only to "search for and seize any property." The trial justice did not have *carte blanche* to issue warrants and seizure orders permitting the state to seize any type of evidence if that evidence did not also constitute "property," a term that the statute does not define.

"It is well settled that when the language of a statute is clear and unambiguous, this Court must interpret the statute literally and must give the words of the statute their plain and ordinary meanings." *Granoff Realty II Limited Partnership v.* *Rossi*, 833 A.2d 354, 361 (R.I.2003) (per curiam) (quoting *Accent Store Design, Inc. v. Marathon House, Inc.*, 674 A.2d 1223, 1226 (R.I.1996)). Considering the plain and ordinary meaning of the word "property," it is difficult for us to construe it in such a way as to include the involuntary seizure of a blood sample extracted from within a living person's body, especially when the person in question has not consented to such an extraction. As this Court noted many years ago in *Pierce v. Proprietors of Swan Point Cemetery*, 10 R.I. 227, 237 (1872), "there is no right of property in a dead body, using the word in its ordinary sense":

> "[t]he body is not property in the usually recognized sense of the word*, yet we may consider it as a sort of quasi property, to which certain persons may have rights, as they have duties to perform towards it arising out of our common humanity. But *the person having charge of it cannot be considered as the owner of it in any sense whatever*; he holds it only as a sacred trust * * *." *Id.* at 242–43. (Emphasis added.) *See also Sullivan v. Catholic Cemeteries, Inc.*, 113 R.I. 65, 68, 317 A.2d 430, 432 (1974).

**2.** General Laws 1956 § 12–5–1(a) provides as follows:
 "A search warrant may be issued by any judge of the district court. Nothing contained in this chapter shall be so construed as to restrain the power of the justices of the supreme or superior courts by virtue of 8–3–6 to issue a search warrant."
General Laws 1956 § 8–3–6 provides as follows:
 "The justices of the supreme and superior court shall, by virtue of their office, be severally conservators of the peace throughout the state, and shall severally have the same power in criminal cases throughout the state that district courts have in their respective districts."

**3.** Section 12–5–2 provides:
 "**Grounds for issuance.** A warrant may be issued under this chapter to search for and seize any property:
 (1) Stolen or embezzled, or obtained by any false pretense, or pretenses, with intent to cheat or defraud within this state, or elsewhere;
 (2) Kept, suffered to be kept, concealed, deposited, or possessed in violation of law, or for the purpose of violating the law;
 (3) Designed or intended for use, or which is or has been used, in violation of law, or as a means of committing a violation of law; or
 (4) Which is evidence of the commission of a crime."

In addition, Black's Law Dictionary defines property as: "The right to possess, use, and enjoy a determinate thing (either a tract of land or a chattel); the right of ownership[; or] * * * [a]ny external thing over which the rights of possession, use, and enjoyment are exercised * * *." Black's Law Dictionary, 1232 (7th ed. 1999). In our view, blood samples taken from a living person's body without his or her consent do not fit into any one of these definitions. Indeed, ever since the enactment of the Thirteenth and Fourteenth Amendments to the United States Constitution and the consequent overruling of the infamous *Dred Scott* case,[4] no living person or people, nor their constituent living parts, can be lawfully considered as "property." Thus, the plain and ordinary understanding of the word "property" excludes blood samples, forcibly taken from living human beings, from the ambit of that term as it is used in § 12–5–2.

In addition, although § 12–5–2 does not define "property," in *DiStefano*, two justices of this Court, in an opinion authored by Justice Goldberg and joined by Chief Justice Weisberger, said that "we are not satisfied that one's bodily fluid is 'property' or evidence of the commission of a crime," even though "it is not the blood itself that is the 'evidence of the commission of a crime,' but rather the test results that are relevant in a criminal trial." *DiStefano*, 764 A.2d at 1167. To be sure, a majority of this Court in *DiStefano* did not need to decide that precise issue to conclude that the "none shall be given" language in G.L. 1956 § 31–27–2.1(b) (the driving-under-the-influence statute) barred the use of a search warrant to seize a nonconsenting motorist's blood after the state arrested the motorist for driving under the influence, death resulting. See *DiStefano*, 764 A.2d at 1163, 1170. Nevertheless, two jus-

tices of this Court in *DiStefano* were of the opinion that § 12–5–2 did not authorize the seizure of a blood sample, while a third justice, although believing that the issue was not properly before the Court, noted that § 12–5–2's "apparent property-seizure limitations * * * as Justice Goldberg's opinion elucidates, raises very difficult and troubling questions about the propriety of issuing search warrants at all to seize a person's blood." *DiStefano*, 764 A.2d at 1172 (Flanders, J., concurring in part and dissenting in part). Moreover, despite a plea from Chief Justice Weisberger, in his separate *DiStefano* opinion, for the Legislature to amend § 12–5–2 and the driving-under-the-influence laws to provide expressly for the seizure of a suspect's blood, *DiStefano*, 764 A.2d at 1171, no such statutory change has occurred to date.

And so this case squarely and unavoidably presents the question that a majority in *DiStefano* addressed but did not decide: whether blood is "property" within the meaning of that term as it is used in § 12–5–2. On that issue, we believe the analysis of that statute that is set forth in the plurality opinion authored by Justice Goldberg in *DiStefano* remains sound, and that the state has not presented us with a compelling reason to deviate from it.

As that opinion elucidates, construing blood and other body parts seized from living human beings as "property" would raise a host of practical and interpretative problems. Similarly, as this Court observed over a century ago in *Pierce* with respect to dead bodies, we do not believe that living human beings own their bodies, body parts, and bodily fluids in a manner that would allow us to construe a person's blood as property—at least in the absence of any evidence that the individual in question had consented to sell or transfer such

---

4. *Dred Scott v. Sandford,* 60 U.S. (19 How.) 393, 15 L.Ed. 691 (1856).

fluids to any authority seeking the involuntary seizure of that person's blood.

Moreover, were we to construe blood samples to be seized from unconsenting living people as "property," then we would soon face arguments that courts can issue even more intrusive warrants for the seizure of other body parts and biological material, and, indeed, of even living persons themselves if needed to prove a criminal case. In *Rochin v. California,* 342 U.S. 165, 172, 174, 72 S.Ct. 205, 96 L.Ed. 183 (1952), for example, the Supreme Court of the United States held that the forcible extraction of a prisoner's stomach contents violated his due-process rights. Although we acknowledge that drawing blood does not implicate the same degree of privacy and due-process concerns that were present in *Rochin,* the forcible extraction and seizure of blood nevertheless involves "an intrusion beyond the body's surface that affects one's human dignity and privacy." *DiStefano,* 764 A.2d at 1167.

In addition, public-policy concerns militate against construing blood samples as falling within the ambit of the search-warrant statute. Violent confrontations could result if the state were allowed to forcibly extract a blood sample from an unwilling suspect or defendant. See *DiStefano,* 764 A.2d at 1169 (citing *State v. Locke,* 418 A.2d 843 (R.I.1980)). Permitting the state to involuntarily extract blood pursuant to a search warrant or a blood-seizure order also would "create many dangerous and unintended consequences that should be dealt with and prevented by legislative enactment, not by judicial fiat." *Id.* Given the aforementioned concerns implicated by allowing search warrants to issue for the forcible seizure of blood samples, we are reluctant to conclude that the Legislature intended to extend the warrant authority of our trial courts to include the seizure of blood samples from people suspected or accused of crimes.

Finally, as was noted in *DiStefano,* although the General Assembly frequently has extended the scope of judicial authority to issue search warrants through specific statutes, it has declined to authorize the general search and seizure of a person's bodily fluids whenever the state can articulate probable cause or even a rational reason to do so. *DiStefano,* 764 A.2d at 1168 (citing G.L. 1956 § 11–19–24 (gambling apparatus and paraphernalia); G.L. 1956 § 11–34–4 (house of prostitution); G.L. 1956 § 19–26–13 (premises of pawnbroker); G.L. 1956 § 30–9–11 (national guard adjutant general may obtain warrant to search for military equipment); G.L. 1956 § 3–12–4 (adulterated liquors); G.L. 1956 § 4–1–19 (place connected with acts that are cruel to animals); G.L. 1956 § 12–5.1–4 (authorizing interception of wire communications); G.L. 1956 § 12–5.2–2 (authorizing use of pen register or trap and trace device)). On the contrary, the Legislature has deliberately identified certain limited and specific circumstances under which a person must submit to the involuntary extraction of his or her blood. *See* G.L. 1956 § 11–37–17 (requiring convicted sexual offenders to submit to blood test to allow state to test for presence of sexually transmitted diseases); G.L. 1956 § 12–1.5–8 (authorizing state to forcibly extract DNA samples from persons found guilty of certain enumerated crimes); G.L. 1956 § 15–8–18.1 (requiring parties to a paternity action to submit to blood tests). But thus far the General Assembly has declined to enact any statutes specifically granting trial judges the power to issue a search warrant that would authorize the state to seize blood from an unwilling suspect accused of some crime—notwithstanding the existence of probable cause to believe the blood sample would be probative of the suspect's guilt or innocence in a pending

criminal case. Because the Legislature has not hesitated to enact statutes extending the warrant authority of our trial courts in certain other limited specific circumstances, and because it has enacted statutes identifying particular situations in which persons must submit to involuntary blood tests, we decline to expand the Superior Court's general warrant authority by interpreting "property" to include the blood of a living person who does not consent to such a seizure.

In its brief, the state argues that *State v. Souza,* 425 A.2d 893 (R.I.1981), not our *DiStefano* decision, should control the disposition of this case. In *Souza,* this Court stated that "[t]here is no question that a court may, upon a showing of probable cause, issue an order authorizing the taking of a blood sample from a person who has been charged with or suspected of a criminal offense, in respect to which the blood sample is determined to be relevant." *Id.* at 899. Significantly, however, the defendant in *Souza* failed to raise the "property" limitation in § 12–5–2 as a reason why the court in that case lacked authority to issue the blood-seizure order. Thus, the *Souza* Court did not have to decide whether the property-seizure limitation on search warrants in § 12–5–2 also applied to blood-seizure orders, because, as a practical matter, such orders were the equivalent of a search warrant for blood. Moreover, the above-quoted language from *Souza* does not address the precise issue we are considering today. In *Souza,* 425 A.2d at 897, the state initially obtained a warrant to seize a sample of blood from the defendant, but a motion justice granted a pretrial motion to quash the warrant, finding that the affidavit upon which it was based contained insufficient information. Thereafter, during the course of the trial, the trial justice granted the state's application to seize blood from the defendant and issued a seizure order to that effect. *Id.*

at 898. This Court affirmed that order, noting that although its timing was unusual in that the court issued the order during the middle of a trial, the court possessed the authority to do so provided the test or order did not impinge on the defendant's privilege against self-incrimination. *Id.* at 899. The Court, however, did not address the effect of the "property" limitation on warrants issued under § 12–5–2 and whether that limitation applied to a mid-trial motion to seize the defendant's blood because the defendant did not raise this issue.

In any event, the issue in this case involves a Superior Court trial justice's authority to issue not merely a blood-seizure order but also a *search warrant* authorizing the state to seize a sample of petitioner's blood. We are not faced with the question of whether, as in *Souza,* a trial justice can issue a mid-trial *order* to seize a blood sample from the defendant after the court has quashed a search warrant to do so. Therefore, our disposition in this case is not controlled by *Souza,* in which the blood-seizure order did not involve the issuance of a search warrant. Moreover, a potentially significant distinction exists between court orders requiring the defendant to furnish a blood sample and an order or warrant authorizing the state to seize blood from an unwilling suspect or defendant. In the former situation, the defendant presumably still retains the right to defy the order by refusing to provide the sample, thereby placing himself or herself in potential contempt of the court. With respect to a blood-seizure order or a warrant authorizing the seizure of a blood sample, however, the person affected has no choice in the matter: the authorities can and will proceed to extract his or her blood by force, if necessary.

■ The state further contends that even if a blood sample does not constitute

"property" under § 12–5–2, Rule 41 of the Superior Court Rules of Criminal Procedure authorizes the Superior Court to issue a warrant for the search and seizure of a blood sample. Like § 12–5–2, Rule 41(b)(4), states that a warrant may issue "to search for and seize any property * * * [w]hich is evidence of the commission of a crime." But unlike the statute, Rule 41(h) proceeds to define the term " 'property,' * * * to include documents, books, papers and any other tangible objects."

To support its Rule 41 argument, the state cites to decisions from other jurisdictions that interpret their analogue to Rule 41 as permitting a court to issue a search warrant to seize a blood sample. *E.g., United States v. Allen,* 337 F.Supp. 1041, 1043 (E.D.Pa.1972) (noting, in the context of Rule 41, that "blood, hair and other bodily components are objects to be seized only through the warrant process"); *State v. Taylor,* 438 A.2d 1279, 1281 (Me.1982) (holding that blood was tangible property subject to the provisions of Rule 41). In addition, the state cites to decisions from other jurisdictions opining that blood qualifies as a "tangible object." *See People v. Epps,* 182 Cal.App.3d 1102, 227 Cal.Rptr. 625, 628 (1986); *Cox v. State,* 473 So.2d 778, 780 (Fla.Dist.Ct.App.1985); *People v. King,* 232 A.D.2d 111, 663 N.Y.S.2d 610, 614 (1997).

■■ Although this Court often looks to the interpretation of analogous federal rules of procedure when construing and applying our own procedural rules, we are not bound by the federal courts' interpretations. *See Smith v. Johns–Manville Corp.,* 489 A.2d 336, 339 (R.I.1985) ("This court has stated previously that where the federal rule and our state rule of procedure are substantially similar, we will look to the federal courts for *guidance* or interpretation of our own rule."). (Emphasis

added.) Similarly, we are not bound by our sister states' interpretation of their analogous rules of criminal procedure, especially when the state cannot point to statutes in these other jurisdictions that are analogous to § 12–5–2. The state's position that Rule 41 provides the Superior Court with the requisite authority to issue search warrants to seize a blood sample might be more persuasive in the absence of § 12–5–2's "property" limitation on search warrants. But because our Constitution provides that the Superior Court's jurisdiction and authority is derived from statutes enacted by the Legislature, and that this authority cannot be extended by judicial interpretation, *see Boss v. Sprague,* 53 R.I. 1, 3, 162 A. 710, 711 (1932) (per curiam), or by the rules of procedure, *see, e.g.,* Super. R. Civ. P. 82 ("[t]hese rules shall not be construed to extend or limit the jurisdiction of the Superior Court or the venue of actions therein"), we must look to the statute, not the rule, in interpreting the breadth of the Superior Court's authority and jurisdiction to issue search warrants for the seizure of blood. Indeed, Rule 41(h) itself provides that "[t]his rule does not modify any act, inconsistent with it, regulating search, seizure and the issuance and execution of search warrants in circumstances for which special provision is made."

■ We also endeavor to harmonize statutes and rules that address the same subject matter when we are asked to interpret them. Thus, we should attempt to construe both the statute and the rule in a manner that avoids a conflict between the scope of their respective authorizations. Likewise, when we are faced with statutory provisions that are in *pari materia,* we construe them in a manner that attempts to harmonize them and that is consistent with their general objective scope. *E.g., Shelter Harbor Fire District v. Vacca,* 835

A.2d 446, 449 (R.I.2003) (per curiam); *In re Petition for Review Pursuant to § 39–1–30 of Ordinance Adopted by City of Providence,* 745 A.2d 769, 773–74 (R.I. 2000); *State v. Souza,* 456 A.2d 775, 781 (R.I.1983). This approach is equally useful when construing a statute and a court rule that address the same subject. *See City of Warwick v. Adams,* 772 A.2d 476, 481 (R.I. 2001) (per curiam) (refusing to construe statute and District Court Rule in inconsistent manner). Therefore, we refuse to interpret Rule 41's definition of the word "property" as including "any other tangible objects" to authorize the seizure of blood samples. Such an interpretation would conflict with our construction of the word "property" in § 12–5–2 as not including blood seized from people suspected of committing a crime without obtaining their consent to do so.

Although it is well settled that when a statute conflicts with a rule of court, the rule controls, *Heal v. Heal,* 762 A.2d 463, 467 (R.I.2000), Rule 41 and the search-warrant statute do not conflict. Although the statute does not define the term "property," Rule 41(h) explains that "property" includes "documents, books, papers and any other tangible objects." These provisions would conflict, therefore, only if we adopted the state's position and construed the term "other tangible objects" in Rule 41 to encompass blood samples seized from unwilling defendants in connection with criminal cases.

 The interpretive doctrines of *noscitur a sociis and ejusdem generis* also support our conclusion that Rule 41's definition of "property" does not extend to blood samples. "Under the doctrine of *'noscitur a sociis,'* the meaning of questionable or doubtful words or phrases in a statute may be ascertained by reference to the meaning of other words or phrases associated with it." *Wigginton v. Centrac-*

*chio,* 787 A.2d 1151, 1155 (R.I.2001) (quoting *DiStefano,* 764 A.2d at 1161). The phrase *noscitur a sociis* translates literally from the Latin as "it is known by its associates." *Allstate Insurance Co. v. Russo,* 641 A.2d 1304, 1307 (R.I.1994). The doctrine of *noscitur a sociis* is similar to, but broader than the doctrine of *ejusdem generic.* *Industrial National Bank v. Sefsick,* 92 R.I. 93, 100, 166 A.2d 417, 420–21 (1961). The latter rule of construction provides that when "a series of specific terms in a statute is followed by a general term * * * the general term, will be construed to embrace only additional examples of a similar nature as those enumerated." *First Republic Corp. of America v. Norberg,* 116 R.I. 414, 419, 358 A.2d 38, 41(1976).

Here, Rule 41(h) defines property as "documents, books, papers and any other tangible objects." The general term, therefore, is "other tangible objects." Applying the doctrine of *noscitur a sociis,* we associate the phrase "other tangible objects" with the preceding words "documents," "books," and "papers." Recognizing that these terms "take color from each other," *Sefsick,* 92 R.I. at 100, 166 A.2d at 421, we cannot construe the rule, as written, to include blood samples or other bodily fluids because of the radically different character of the specified inanimate objects from bodily fluids seized from living human beings.

We reach this same result when we apply the narrower doctrine of *ejusdem generis,* which instructs us to interpret "tangible objects" as embracing only evidence that is of a similar nature to "documents, books, [or] papers." Given the obvious distinctions and differences between "documents, books, [and] papers" and bodily fluids such as blood, we refuse to include blood samples involuntarily extracted from living human beings as falling within the

definition of "tangible objects" in Rule 41(h). Blood seized from a living human being is simply not an additional example of a tangible object "of a similar nature as those enumerated" in the preceding clause of the Rule ("documents, books, papers").

The petitioner finally argues that even if the Superior Court had the authority to issue a search warrant authorizing the state to seize a sample of his blood, such a warrant would violate the Rhode Island Constitution's privilege against self-incrimination. *See* R.I. Const. art. 1, sec. 13 ("No person in a court of common law shall be compelled to give self-criminating evidence."). Citing to one of the separate opinions in *DiStefano,* 764 A.2d at 1171 (Flanders, J., concurring in part and dissenting in part), the petitioner urges us to interpret the language used in the constitution's Art. 1, sec. 13 self-incrimination privilege as affording greater protections to individual defendants than the corresponding but differently worded federal constitutional privilege. Given our ability to resolve this case on the basis of statutory interpretation, however, we have no need to reach and decide this constitutional question. In any event, because the petitioner failed to raise this constitutional issue below, we "will not consider an issue raised for the first time on appeal that was not properly presented before the trial court." *Bouchard v. Clark,* 581 A.2d 715, 716 (R.I.1990). For these reasons, we do not address the merits of the petitioner's self-incrimination claim.

### *Conclusion*

In sum, we hold that the word "property" in § 12–5–2 does not include blood samples seized involuntarily from criminal defendants or suspects. We also refuse to interpret Rule 41 in a manner inconsistent with § 12–5–2 and in contravention of our rules of statutory construction. And given the property-seizure limitation on the issuance of warrants under § 12–5–2, we also hold that the Superior Court lacked the authority to issue blood-seizure orders such as the one that the court issued in this case, authorizing the state to apply for a search warrant to seize a sample of the petitioner's blood. Thus, we reverse, quash the blood-seizure order and search warrant in question, and remand the case to the Superior Court with our decision endorsed thereon for further proceedings consistent with this opinion.