Issued June 17, 2020

Corrected June 18, 2020

**Supreme Court**

No. 2018-134-C.A.

(P1/17-1875A)

State                                    :

v.                                    :

Malcolm Querido.                    :

NOTICE:    This  opinion  is  subject  to  formal  revision  before
publication in the Rhode Island Reporter.  Readers are requested to
notify  the  Opinion  Analyst,  Supreme  Court  of  Rhode  Island,
250 Benefit Street, Providence, Rhode Island 02903, at (401) 222-
3258 of any typographical or other formal errors in order that
corrections may be made before the opinion is published.

|              |   |
|--------------|---|
| State        | : |
| v.           | : |
| Malcolm Querido. | : |

Present:  Suttell, C.J., Goldberg, Flaherty, Robinson, and Indeglia, JJ.

**O P I N I O N**

**Justice Goldberg, for the Court.**  This case concerns an appeal by the state from a Superior Court order suppressing the DNA results of a buccal swab taken from the defendant, Malcolm Querido, pursuant to a valid search warrant, while he was incarcerated at the Adult Correctional Institutions.  This case came before the Supreme Court on February 19, 2020, in accordance with an order directing the parties to appear and show cause as to why the issues raised in this appeal should not be summarily decided.  After considering the parties' written and oral submissions and reviewing the record, we conclude that cause has not been shown and that this case may be decided without further briefing or argument.  For the reasons set forth in this opinion, we vacate the order and remand this case to the Superior Court with directions to issue an order denying the motion to suppress.

**Facts and Travel**

In July 2017, a grand jury returned an indictment charging defendant with the murder of Robert Bullard, who died from multiple stab wounds on September 7, 2014.  At the crime scene,

members of the Providence Police Department observed blood droplets on the stairs in the common hallway and outside of the apartment building in which the murder occurred. The Rhode Island Department of Health (RIDOH) laboratory analyzed the blood samples and determined that they matched a DNA sample in the Combined DNA Index System (CODIS) of an individual named Malcolm J. Querido.[1] However, RIDOH requested that a second DNA sample be taken from defendant in order to confirm that the DNA in the CODIS was in fact that of defendant.

It was not until three years after the homicide that defendant was apprehended in New York and subsequently taken into custody by the Providence Police Department. A criminal complaint was filed on June 2, 2017, and defendant was held without bail at the ACI. On June 7, 2017, Detective Jason Simoneau of the Providence Police Department obtained a search warrant

---

[1] Authorized by Congress in 1994 and maintained by the Federal Bureau of Investigation, "the Combined DNA Index System (CODIS) connects DNA laboratories at the local, state, and national level." *Maryland v. King*, 569 U.S. 435, 444 (2013). The CODIS includes all fifty states and multiple federal agencies. *Id.* at 444-45. The Court in *King* described the CODIS processes and procedures as follows:

> "CODIS collects DNA profiles provided by local laboratories taken from arrestees, convicted offenders, and forensic evidence found at crime scenes. To participate in CODIS, a local laboratory must sign a memorandum of understanding agreeing to adhere to quality standards and submit to audits to evaluate compliance with the federal standards for scientifically rigorous DNA testing.
>
> "* * *
>
> "In short, CODIS sets uniform national standards for DNA matching and then facilitates connections between local law enforcement agencies who can share more specific information about matched [DNA] profiles." *Id.* at 445.

to collect defendant's DNA at the ACI using a common procedure known as a "buccal swab."[2] When a Providence police officer attempted to execute the search warrant, however, defendant refused to comply. Detective Simoneau then sought and obtained a second search warrant on June 21, 2017, which authorized the collection of defendant's DNA through a buccal swab, drawn blood sample, or his toothbrush.

Detective Simoneau attempted to execute the second search warrant at the ACI the following day. He first met with defendant in a "collateral office" at the ACI and provided him with a copy of the second search warrant for his review. Detective Simoneau, along with a Bureau of Criminal Identification (BCI) detective, then proceeded to defendant's cell to obtain his toothbrush. According to Det. Simoneau, however, the toothbrush was brand new and unused. A correctional officer informed Det. Simoneau that defendant had requested a new toothbrush a week earlier, and that his old toothbrush may still be in the property room at the ACI. It was not. At that point, Det. Simoneau obtained the warden's permission to obtain a buccal swab.

The following facts are gleaned from two video recordings—at least a portion of which was played during the suppression hearing before the Superior Court—that captured the events leading up to, and including, the seizure of the buccal swab. In the first video, a correctional

---

[2] The United States Supreme Court has provided some guidance on the nonintrusive "buccal swab" procedure:

> "Buccal cell collection involves wiping a small piece of filter paper or a cotton swab similar to a Q-tip against the inside cheek of an individual's mouth to collect some skin cells. * * * The procedure is quick and painless. The swab touches inside an arrestee's mouth, but it requires no 'surgical intrusion beneath the skin,' * * * and it poses no 'threat to the health or safety' of arrestees[.]" *King*, 569 U.S. at 444 (brackets omitted) (quoting first J. Butler, *Fundamentals of Forensic DNA Typing* 5, 86 (2009), and second *Winston v. Lee*, 470 U.S. 753, 760, 763 (1985)).

officer went to defendant's cell and directed him to place his hands through the slot in the cell door, in order to be handcuffed. The defendant refused to comply and covered the slot with a mattress. A correctional officer advised defendant that pepper spray would be dispensed into his cell if he did not cooperate. The defendant refused, and the officer inserted the pepper spray into the cell through what appeared to be an apparatus designed for that purpose.

At that point, an extraction team of correctional officers was formed to assist in the execution of the search warrant. In the second video, a correctional officer introduced each member of the team and described his or her respective role in the extraction. It was relayed that the reason for removing defendant from the cell was his repeated refusal to comply with two valid search warrants authorizing the collection of a DNA sample. The officer informed the extraction team members that he would approach the cell one more time and afford defendant a final opportunity to comply with their orders. If defendant refused to comply, additional pepper spray extraction procedures would be employed. Should defendant continue to refuse to comply, the extraction team would forcibly remove defendant from the cell and place him in a restraint chair in order to obtain the DNA sample.

Although more pepper spray was utilized, defendant persisted in his refusal. The cell extraction team then executed a forced entry and removed defendant from the cell. They placed defendant in shackles and led the loudly complaining defendant to a room where he was strapped to a restraint chair.[3] The defendant then indicated that he would submit to the procedure. He did not. The defendant refused to open his mouth. Members of the extraction team then grabbed defendant's head and held it against the chair's headrest while the BCI detective obtained an adequate buccal swab. Unsurprisingly, the DNA results of the buccal swab taken from defendant

---

[3] During this time, defendant was whining and complaining about the correctness of the search warrant.

- 4 -

at the ACI matched the DNA sample in the CODIS, and thus the blood samples from the crime scene.

On July 6, 2017, defendant admitted to violating a probationary term on an unrelated felony conviction and was sentenced to four years at the ACI. On July 10, 2017, a grand jury returned an indictment charging defendant with the murder of Robert Bullard.

In March 2018, defendant filed a motion to suppress and a motion for an evidentiary hearing based on an alleged violation of *Franks v. Delaware*, 438 U.S. 154 (1978), which was not the issue ultimately decided by the trial justice.[4] Then, on the eve of trial, on April 8, 2018, defendant filed a motion to dismiss the indictment based on allegedly outrageous government conduct relating to the murder investigation, including the seizure of blood at the crime scene. At a hearing two days later, the trial justice ordered defendant to address his allegations of outrageous government conduct; defendant argued that, in addition to the two assertions in his written motions, the buccal swab "was procured through physical coercion[,]" and therefore the indictment should be dismissed. The state presented one witness, Det. Simoneau, and the trial justice viewed the video recording from the ACI. The trial justice then summarily granted defendant's motion to suppress the DNA evidence. He made no findings of fact or conclusions of law.[5]

---

[4] What is commonly referred to as a "*Franks* Hearing" is a procedure used to challenge the veracity of the police in procuring an affidavit in support of a warrant. *See Franks v. Delaware*, 438 U.S. 154, 171-72 (1978). To qualify for a *Franks* Hearing, there must be a suitable preliminary proffer of material falsity for such a review, that is "deliberate misstatements, and those of reckless disregard" for the truth. *Id.* at 170.

[5] After the trial justice granted the motion to suppress, the state indicated that it intended to appeal the ruling and requested a stay pending appeal. The trial justice denied the stay, stating: "Do you want a stay? I'm not giving you one. * * * Go upstairs and get it." The trial justice revisited his ruling the following day, however, and granted the state a stay pending appeal.

The following day, the state asserted that it was not given enough time to prepare a complete evidentiary presentation to address the contentions of the alleged use of excessive force to obtain the buccal swab. The state requested that it be permitted to present additional evidence and testimony on the issue. The trial justice denied the state's request. He declared that before resorting to the use of force to extract the DNA sample, the state should have asked the court to hold defendant in contempt. The trial justice also characterized the video recording of the obtaining of the buccal swab as "one of the most disturbing clips I have seen in a long, long time." The trial justice continued:

> "It reflected conduct of law enforcement officers * * * acting in a most unsettling manner. And I use the word 'unsettling' very charitably.

> "The defendant was housed in a tiny little room about the size of a phone booth, no ventilation. The authorities had a warrant for a buccal swab. He had not been compliant the first time. I'm aware of that. This was a second time. The officers snaked a tube in the man's cell-like holding room and dispensed a noxious gas into that room until he was overcome and lying on the floor. Then the officers arrived in Hazmat suits and, indeed, in old-fashioned gas masks to avoid inhaling the noxious fumes.

> "* * *

> "They then opened the door, dragged the man out, manacled from his wrists to his ankles, barefoot, shuffled him down a hallway, six abreast, as far as I could count—there might have been more outside of the frame of the video picture—brought him to a wooden-type chair * * * forced him into the chair, strapped him into it and then forcibly, hands around the throat, and more than one set of hands upon him, pried open his mouth and stuck a Q-Tip down his throat, in an effort to take a swabbing from his cheek.

> "* * *

> "In my view, the reaction and the actions of the law enforcement officers at the ACI was way beyond the pale, overreaching, to a point totally unacceptable. * * * It was unnecessary, appallingly

- 6 -

so, to resort to the force that was utilized that I saw on that video.
And it is for those reasons that I granted the motion to suppress."

The trial justice suppressed the evidence, and an order entered on April 11, 2018. The state timely appealed under G.L. 1956 § 9-24-32.[6] *See State v. Alexander*, 115 R.I. 491, 493, 348 A.2d 368, 370 (1975) (explaining that, "absent a constitutional or statutory provision[,] the state has no right to appeal in a criminal proceeding").

## Standard of Review

"In reviewing the grant or denial of a motion to suppress, this Court accords deference to the trial justice's factual findings and accepts those findings unless they are clearly erroneous." *State v. Morris*, 92 A.3d 920, 924 (R.I. 2014). "We engage in a *de novo* review of any questions of law and of mixed questions of law and fact involving constitutional issues." *Id.*

---

[6] General Laws 1956 § 9-24-32, entitled "State's right to appeal[,]" provides, in pertinent part:

> "In any criminal proceeding, the attorney general shall have the right to object to any finding, ruling, decision, order, or judgment of the [S]uperior [C]ourt or [F]amily [C]ourt, and the attorney general may appeal the findings, rulings, decisions, orders, or judgments to the [S]upreme [C]ourt at any time before the defendant has been placed in jeopardy[.]"

The procedure for a state's appeal is governed by § 9-24-33, entitled "Procedure for state's appeal[,]" which provides, in pertinent part:

> "The attorney general shall file notice of his or her intention to appeal to the [S]upreme [C]ourt with the clerk of the [S]uperior or [F]amily [C]ourt, together with a written request to the court stenographer for a transcript for so much of the testimony as may be required, within twenty (20) days after any adverse finding, ruling, decision, order, or judgment is entered or made, when such has been entered or made, before the defendant has been placed in jeopardy; and the filing shall stay the finding, ruling, decision, order, or judgment which the attorney general is appealing * * *. An appeal taken pursuant to this section shall proceed in accordance with the rules of appellate procedure of the [S]upreme [C]ourt."

**Analysis**

On appeal, the state argues that the trial justice erred in suppressing the DNA evidence from the buccal swab obtained from defendant pursuant to a valid search warrant. The state argues that it was not required to return to court to seek to hold defendant in contempt for failing to comply with the search warrant, and that the force used to execute the search warrant and obtain a DNA sample from defendant was objectively reasonable under *Graham v. Connor*, 490 U.S. 386 (1989), which held that the Fourth Amendment and its "objective reasonableness" standard governs all claims of excessive force used by law enforcement in the course of an investigatory stop, arrest, or seizure of an individual. *Graham*, 490 U.S. at 388.

We begin with the issue of whether the state was required to return to court to seek to hold defendant in contempt for refusing to comply with the search warrant. In granting the motion to suppress based on the use of excessive force by the officers in obtaining the DNA sample, the trial justice declared that "all the [s]tate had to do" was ask the court to hold defendant in contempt for failing to comply with the search warrant. We deem this error. The United States favors the use of search warrants for the lawful seizure of evidence. *Illinois v. Gates*, 462 U.S. 213, 236 (1983) (discussing the Fourth Amendment's strong preference for searches and seizures conducted pursuant to a warrant). In Rhode Island, the Superior Court's power to issue a search warrant is conferred by statute. *See, e.g.*, *State v. Dearmas*, 841 A.2d 659, 662 (R.I. 2004) ("[G.L. 1956 § 12-5-1(a) and G.L. 1956 § 8-3-6 vest the justices of the District and Superior Courts with the authority to issue search warrants."); *State v. DiStefano*, 764 A.2d 1156, 1168 (R.I. 2000) ("The scope of the Superior Court's warrant authority is delineated by the Legislature, in which all power not explicitly granted to another branch of government resides.").

In *Dearmas*, this Court grappled with the extent of the court's warrant authority under § 12-5-2, which, at the time, authorized courts to issue a search warrant for the seizure of "property" that was "evidence of the commission of a crime." *Dearmas*, 841 A.2d at 662. In that case, we held that the Superior Court exceeded its warrant authority under § 12-5-2 by issuing a search warrant for the seizure of a blood sample from the defendant. *Id.* at 668. We reasoned that the court had no authority to order the seizure of blood because it did not constitute "property" under § 12-5-2. *Id.* Notably, however, we observed that, if § 12-5-2 had authorized the courts to issue a search warrant for the seizure of, for example, a blood sample, the police would be authorized to seize that evidence involuntarily from a nonconsenting defendant. *Id.* at 665. We also acknowledged the "significant distinction" between a search warrant authorizing the seizure of a blood sample and a court order requiring a defendant to furnish a blood sample. *Id.* Concerning a court order, "the defendant presumably still retains the right to defy the order by refusing to provide the sample, thereby placing himself or herself in potential contempt of the court." *Id.* "With respect to a * * * warrant authorizing the seizure of a blood sample, however, the person affected has no choice in the matter: the authorities can and will proceed to extract his or her blood by force, if necessary." *Id.*

In 2004, shortly after our decision in *Dearmas*, the General Assembly amended § 12-5-2, extending the warrant authority of Rhode Island courts to issue warrants for the seizure of "blood, saliva, hair, bodily tissues, bodily fluids, or dental impressions from the body of a person, that may yield evidence of the identity of the perpetrator of a crime when subjected to scientific or other forensic analysis." Section 12-5-2(5); *see* P.L. 2004, ch. 493, § 1.

In the case at bar, the police obtained a valid search warrant under § 12-5-2 that commanded the officers to obtain a DNA sample by a buccal swab, drawn blood sample, or

toothbrush. Accordingly, as *Dearmas* contemplated, because the search warrant authorized the seizure of evidence that was within the court's warrant authority under § 12-5-2, defendant had "no choice in the matter[,]" and the state was allowed to use reasonable force, "if necessary[,]" to seize a DNA sample of defendant. *Dearmas*, 841 A.2d at 665. The state was not required to return to court to seek a contempt order, and defendant had no right to refuse to comply. As noted, the warrant was a command by the court to the police to seize the DNA sample. It was not directed to defendant.

We now turn to whether the use of force in executing the search warrant was excessive or "objectively reasonable" under the Fourth Amendment and the balancing test set forth by the United States Supreme Court in *Graham*, cited *supra*. The Fourth Amendment guarantees "the right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures[.]" *Maryland v. King*, 569 U.S. 435, 446 (2013) (brackets omitted); *see Schmerber v. California*, 384 U.S. 757, 767 (1966) ("The overriding function of the Fourth Amendment is to protect personal privacy and dignity against unwarranted intrusion by the State."). The ultimate measure of the constitutionality of a search is reasonableness. *King*, 569 U.S. at 448. A search or seizure must be reasonable in its scope and manner of execution. *Id.*; *see Tennessee v. Garner*, 471 U.S. 1, 8 (1985) (holding that reasonableness of a particular seizure depends not only on when the seizure is made, but also on how it is carried out).

The law is quite settled that the *Graham* balancing test applies to "*all* claims that law enforcement officers have used excessive force—deadly or not—in the course of an arrest, investigatory stop, or other 'seizure' of a *free citizen* should be analyzed under the Fourth Amendment and its 'reasonableness' standard[.]" *Graham*, 490 U.S. at 395 (second emphasis added). We contrast the availability of this balancing test as it relates to convicted prisoners. *See*

*Hudson v. McMillian*, 503 U.S. 1, 6-7 (1992) (explaining that a convicted prisoner's claim of excessive force is governed by the Eighth Amendment standard of "whether force was applied in a good-faith effort to maintain or restore discipline, or maliciously and sadistically to cause harm"); *Whitley v. Albers*, 475 U.S. 312, 319 (1986) (holding that the legal standard that governs an Eighth Amendment claim of a convicted prisoner who was shot by a guard during a prison riot is whether the conduct amounted to "the unnecessary and wanton infliction of pain") (quoting *Ingraham v. Wright*, 430 U.S. 651, 670 (1977)). This case is somewhat of a hybrid, however, because defendant had been convicted and was incarcerated for a different offense when the police executed the search warrant and seized the DNA sample, but not yet sentenced as a probation violator. Nonetheless, we look to *Graham* to determine if the use of force in seizing defendant's DNA was reasonable under the Fourth Amendment. *See Scott v. Harris*, 550 U.S. 372, 381 (2007) ("[A] claim of 'excessive force in the course of making a seizure of the person is properly analyzed under the Fourth Amendment's objective reasonableness standard.'") (brackets and deletions omitted) (quoting *Graham*, 490 U.S. at 388).

Under *Graham*, the court must weigh "'the nature and quality of the intrusion on the individual's Fourth Amendment interests' against the countervailing governmental interests at stake." *Graham*, 490 U.S. at 396 (quoting *Garner*, 471 U.S. at 8). The court must pay "careful attention to the facts and circumstances of each particular case, including the severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officers or others, and whether he is actively resisting arrest or attempting to evade arrest by flight." *Id.* The "reasonableness" of the use of force by law enforcement is evaluated on a case-by-case basis: the focus is on "whether the officers' actions are 'objectively reasonable' in light of the facts and

circumstances confronting them, without regard to their underlying intent or motivation." *Id.* at 397.

We begin with the nature and extent of the government intrusion on defendant's Fourth Amendment interests. The Supreme Court has stated that "[a] crucial factor in analyzing the magnitude of the intrusion is the extent to which the procedure may threaten the safety or health of the individual[.]" *King*, 569 U.S. at 464 (deletion omitted) (quoting *Winston v. Lee*, 470 U.S. 753, 761 (1985)). In *Schmerber*, for example, the Supreme Court explained that a blood test is "reasonable" because it does not threaten the health or safety of the individual and does not constitute an unduly extensive intrusion on the individual's Fourth Amendment interests. *Schmerber*, 384 U.S. at 771. In *King*, the Supreme Court further explained that "[a] buccal swab is a far more gentle process than a venipuncture to draw blood[,]" as it "involves but a light touch on the inside of the cheek" and "requires no 'surgical intrusions beneath the skin.'" *King*, 569 U.S. at 446 (quoting *Winston*, 470 U.S. at 760).

In this case, the nature and extent of the government intrusion on defendant's Fourth Amendment interests was *de minimis*. The defendant, by virtue of his incarceration, enjoyed diminished constitutional protections under the Fourth Amendment. *See Bell v. Wolfish*, 441 U.S. 520, 557 (1979) ("[G]iven the realities of institutional confinement, any reasonable expectation of privacy that a detainee retained necessarily would be of a diminished scope."). Moreover, as the Supreme Court explained in *King*, the buccal swab procedure posed no threat to defendant's health or safety and constituted a brief and minimal intrusion on defendant's expectations of privacy. *See King*, 569 U.S. at 464. Likewise, the use of force in executing the search warrant and seizing a DNA sample from defendant was also minimally intrusive. The police sought and received two valid search warrants authorizing the seizure of a DNA sample of defendant

through a buccal swab, the second of which also commanded the seizure by drawn blood sample or toothbrush. Thus, there was judicial approval to seize a DNA sample from defendant using force, if necessary. *See Dearmas*, 841 A.2d at 665. There was no valid reason for defendant's refusal to cooperate. Before resorting to the use of force, the officers provided defendant with a copy of the search warrant to review, afforded him with multiple opportunities to comply, and attempted to seize the DNA sample through less physical means—defendant's toothbrush—but was prevented from doing so by defendant's apparent efforts to avoid inevitable detection by failing to brush his teeth.

We are satisfied that the use of force in collecting a buccal swab of defendant was minimally intrusive under the Fourth Amendment; it was authorized by the court in the form of two valid search warrants and was necessitated because defendant refused to comply, despite being given multiple opportunities to do so. *See Staples v. Gerry*, 923 F.3d 7, 17, 18 (1st Cir. 2019) (holding that the use of pepper spray was reasonable because the defendant refused multiple orders over several days to leave his cell); *Hammer v. Gross*, 932 F.2d 842, 845 (9th Cir. 1991) (holding that the Fourth Amendment "does not preclude the use of force in some circumstances to extract a blood sample from a resistant suspect").

The countervailing government interests in seizing the DNA sample also weigh in favor of the state. First, the state has a significant interest in fairly and accurately determining guilt or innocence. *See Winston*, 470 U.S. at 762 (noting that the community's interest in fairly and accurately determining guilt or innocence "is of course of great importance"). The type of evidence in this case is pertinent to that interest because DNA evidence provides "unparalleled accuracy" in identifying perpetrators of crime. *King*, 569 U.S. at 451. The state sought the DNA evidence to confirm that it was defendant's DNA sample in the CODIS that matched the DNA

taken from the blood sample at the crime scene. Accordingly, we give "great weight both to the significant government interest at stake in the identification of arrestees and to the unmatched potential of DNA identification to serve that interest." *Id.* at 461. Second, this is a murder case. The state has a significant interest in the DNA evidence because the crime at issue is especially severe—a brutal homicide. Third, defendant posed an immediate threat to the safety of the officers involved in the seizure of the DNA sample. The record reveals that the Providence police requested that the warrant include the seizure of defendant's toothbrush in the second application to minimize safety concerns in light of defendant's disciplinary history at the ACI and his prior refusal to comply. Moreover, in the second video, the officer informed the members of the extraction team that defendant was dangerous and extremely uncooperative. *See Los Angeles County, California v. Rettele*, 550 U.S. 609, 614 (2007) ("In executing a search warrant officers may take reasonable action to * * * ensure their own safety and the efficacy of the search."). Fourth, as previously discussed, defendant actively resisted the efforts of law enforcement in seizing the DNA sample. The defendant refused to comply with two valid search warrants as well as multiple orders to be handcuffed. What is more, defendant's reasons for refusing were pretextual. He grumbled about the county where the warrant was signed—a meritless assertion. Thus, the countervailing government interests in seizing the DNA sample from defendant were significant and weigh in favor of the state.

In conclusion, the use of force in this case was objectively reasonable under the *Graham* balancing test because the intrusion into the defendant's Fourth Amendment interests was minimal and was far outweighed by the countervailing government interests. Indeed, we discern nothing inappropriate or excessive about the use of force in seizing the buccal swab of this

recalcitrant and hyperbolic suspect. Accordingly, we are of the opinion that the trial justice erred in suppressing the buccal swab evidence.

**Conclusion**

For the reasons set forth in this opinion, we vacate the Superior Court order and remand this case to the Superior Court with directions to issue an order denying the motion to suppress. The papers in this case shall be returned to the Superior Court.

**Justice Flaherty, dissenting.** I respectfully dissent from the majority's holding that this Court, based on its own review of the video of the defendant's extraction from his cell and forced taking of a buccal swab, should vacate the trial justice's order of suppression and direct that an order be entered denying the motion to suppress the test results.

I share the view expressed by the trial justice that at least some portions of the video are disturbing and raise questions about whether an excessive level of force was used to obtain the buccal swab from the cheeks of the defendant. I refer with particularity to that portion of the video that portrays several officers forcing defendant's mouth open. The issue to me is not whether defendant had the right to decline testing in the face of an apparently valid search warrant. Clearly, he did not. Rather, the issue is whether the officers went beyond the bounds of reasonableness when defendant refused to comply.

I agree that the balancing test set forth in *Graham v. Connor*, 490 U.S. 386 (1989), is the appropriate test; but in the face of the record before us, it is clear to me that some of the factors of the balancing test militate in favor of defendant and some in favor of the state. There seems to be no question that, despite defendant's personal legal analysis to the contrary, the warrant was valid, commanded the officers to act upon it, *see State v. Thomas*, 936 A.2d 1278, 1283-84 (R.I.

- 15 -

2007), and demanded compliance from defendant. Also, it is indisputable that the indictment returned against defendant, for murder, was extremely serious.

There was, however, no testimony as to any fear or concern that may have been harbored by the officers on the extraction team.[1] Further, although defendant was extremely uncooperative, he was not resisting arrest, nor was there any chance whatsoever that he would flee to avoid justice, because he was already incarcerated. Moreover, I believe that the Court should take into account an additional consideration: the nature of the evidence that law enforcement sought to retrieve from his person. DNA evidence is not the same as, for instance, blood alcohol content, which degrades over a relatively short period of time. Neither is it akin to physical evidence of a crime, such as contraband or drugs, which can be easily destroyed or flushed down a toilet if not recovered immediately, by force if necessary. In other words, there was no urgency here. In *Graham*, the Supreme Court said: "The calculus of reasonableness must embody allowance for the fact that police officers are often forced to make split-second judgments—in circumstances that are tense, uncertain, and rapidly evolving—about the amount of force that is necessary in a particular situation." *Graham*, 490 U.S. at 396-97; *see Thomas*, 936 A.2d at 1284 (quoting *Graham*, 490 U.S. at 396-97). However, the buccal swab of defendant's cheeks would have yielded the same results whether the sample was obtained on the day the extraction team forced it from defendant, or next week, next month, or ten years from now.

---

[1] Not only did the trial justice not have the benefit of such testimony, the record reveals that at no time did the trial justice have the benefit of viewing the "second video[,]" in which a correctional officer describes the extraction process to take place. Nevertheless, the majority uses this heretofore unseen video to form part of the basis of its decision.

Further, the trial justice did not employ the *Graham* test when reaching his conclusion, and it is not this Court's role to take the first pass on whether a search and seizure is or is not reasonable under the applicable legal standard.

For all these reasons, and given the unusual posture of this case, wherein the state received short notice of the issue to be addressed by defendant at the hearing, it is my opinion that this case should be remanded for a full evidentiary hearing, with findings of fact and conclusions of law set forth by the trial justice.

I therefore respectfully dissent from the holding of the majority.

## SUPREME COURT – CLERK'S OFFICE

## OPINION COVER SHEET

| | |
|---|---|
| **Title of Case** | State v. Malcolm Querido. |
| **Case Number** | No. 2018-134-C.A. (P1/17-1875A) |
| **Date Opinion Filed** | June 17, 2020 |
| **Justices** | Suttell, C.J., Goldberg, Flaherty, Robinson, and Indeglia, JJ. |
| **Written By** | Associate Justice Maureen McKenna Goldberg |
| **Source of Appeal** | Providence County Superior Court |
| **Judicial Officer From Lower Court** | Associate Justice Robert D. Krause |
| **Attorney(s) on Appeal** | For State:<br><br>Christopher R. Bush<br>Department of Attorney General<br><br>For Defendant:<br><br>George J. West, Esq. |