**STATE**

v.

**Gary TASSONE.**

**No. 97–610–C.A.**

Supreme Court of Rhode Island.

April 27, 2000.

Jane M. McSoley, Aaron L. Weisman, Providence, for Plaintiff.

Janice M. Weisfeld, Paula Rosin, Providence, for Defendant.

Present WEISBERGER, C.J., and LEDERBERG, BOURCIER, FLANDERS and GOLDBERG, JJ.

## OPINION

GOLDBERG, Justice.

On the morning of June 30, 1994, a woman and her two young nephews, ages four and seven, were collecting sea shells on Crescent Beach in Riverside, Rhode Island. Sadly, the outing was brought to an abrupt and traumatic end when the seven-year-old spotted what appeared to be a human arm sticking out of the sand. Shortly after the woman reported this gruesome discovery to the police, the body of thirty-year-old Kendra Hutter (Kendra), a mother of two from Pawtucket, Rhode Island, was unearthed from the beach by the state medical examiner. Kendra had suffered numerous chopping wounds to her face, neck and skull; the medical examiner said later that she had suffered a skull fracture and other traumatic injuries to her brain caused by striking blows with a chopping-type instrument (which was later determined to be a shovel), resulting in brain swelling and eventual death.

The defendant, Gary Tassone (defendant or Tassone), was found guilty of the murder of Kendra by a jury on January 28, 1997; a justice of the Superior Court thereafter sentenced him to life imprisonment without the possibility of parole. The defendant has appealed to this Court.

## FACTS [1]

The murder investigation following the discovery of Kendra's body was assisted by Christopher Hutter (Chris), Kendra's estranged husband with whom Kendra had resided along with the couple's two children. On June 30, the day Kendra's body was discovered, Chris reported Kendra missing to the Pawtucket Police Department. Chris told the police that when Kendra went out at approximately 9 p.m. the night before, she left a business card inscribed with the name "Gary" and a phone number that indicated where she could be reached. Chris said that he called the phone number that day and spoke with "Gary," who told him that he had not seen Kendra since June 28.

The next day, July 1, Detectives Corporal Arthur Clark (Det. Clark) and Kenneth Bilodeau (Det. Bilodeau) of the East Providence Police Department responded to the address that corresponded to the phone number on the card. There they spoke with Gary Tassone, the defendant in this case, who told them he had met Kendra through the personal advertisements in the newspaper. The defendant said he had dated Kendra in the past, and that he had planned a date with her on June 29,

---

1. The facts in this case were obtained from the trial transcript and the Superior Court file.

but that she had canceled. Following approximately twenty minutes of conversation, the detectives asked defendant if he would go to the station to answer questions regarding Kendra's murder. According to both detectives, defendant agreed, and after making a phone call (purportedly to cancel his bowling night), defendant followed the detectives in his own vehicle to the East Providence police headquarters from his home in Cumberland.

Once at the station, defendant signed four separate written statements to the police throughout the course of the night and into the next day. In his second statement, which was given at approximately 10:45 p.m. on July 1, defendant stated that he did in fact go on a date with Kendra on the night of June 29, 1994. He admitted that he picked Kendra up at her home, drove her to a beach in Riverside, had sexual intercourse with her on a blanket, and then drove her home. In defendant's third statement to police, which he gave a little over an hour after his second statement, at midnight, he stated that he did not bring Kendra home after the date, but instead, while he was on the beach with Kendra, "[s]omething jumped in the woods" near him and scared him, and he "swung the shovel at the sound but hit Kendra in the face." He stated that Kendra then fell to the ground bleeding, and that he was "scared" he had killed her, so he "used the shovel to cover her up with sand so nobody would know." Based on these incriminating statements, defendant was arrested for the crime of murder. Thereafter, a grand jury returned an indictment charging defendant with one count of murder in violation of G.L.1956 § 11–23–1. Additional facts will be provided as necessary to address the issues raised in defendant's brief.

## DISCUSSION

This case came before the Court on December 8, 1999, on defendant's appeal

from the judgment of conviction following the guilty verdict for which, based on the jury's finding that this murder was committed in a manner involving torture or an aggravated battery to the victim, defendant was sentenced pursuant to § 11–23–2(4) to life in prison without the possibility of parole. On appeal, defendant raised four issues, which we shall address in the order they appear in his brief.

### I

### Motions to Exclude Gun Evidence

At 11:15 on the morning of July 2, 1994, defendant signed his fourth and final statement to the police detectives at the East Providence police station. That statement, which comprised three typewritten pages, concluded with the following paragraph:

> "Also I think police should get a handgun out of my room because my mother would not want it in the house with her and I know because of these charges I should not have it. It is a .32 Cal. semi-auto pistol. It is in a locked video case in my bedroom. The key is in the bottom of a cup with pens near the address book I [also] want you to get."

Prior to trial, the defendant moved *in limine* to exclude testimony relating to the existence of the gun, arguing that the gun had no relevance to the crime involved in this case and that the introduction of this evidence would be overly prejudicial. The trial justice found that inasmuch as defendant was challenging the voluntariness of his statements by arguing that he was physically exhausted and deprived of sleep at the time he made the fourth statement (thus rendering the statement involuntary), this claim could be countered by evidence that defendant was alert enough to mention the gun and disclose his concerns about its presence in his mother's home. Therefore, the trial justice denied the motion *in limine*.[2]

**2.** When denying the motion, the trial justice advised defense counsel that:

At trial, while testifying about the police interrogation of defendant and the circumstances surrounding the signed statements given by the defendant, Det. Clark was permitted to read defendant's four statements to the jury. At the point when Det. Clark was preparing to read the fourth statement, however, defense counsel moved to redact the last paragraph relating to the firearm. The motion was denied by the trial justice.[3] After Det. Clark read the fourth statement and further testified that it had been signed by himself, Det. Bilodeau, and defendant, the trial justice gave the following limiting instruction to the jury:

> "Members of the jury, the last paragraph of this statement in which the defendant asks the police to get a handgun out of his room; this information comes in for a limited purpose. It does not come in to show you that the defendant is a bad person because he owns a gun and that therefore there's a probability that he committed this offense. It comes in to show a state of mind; that is to say whether—the question of whether or not the defendant was alert, mentally alert at that time. So, it has that limited purpose, and, at the close of the case, when I more fully instruct you, I'll remind you about the limited purpose for which that testimony came in."

"You may, of course, wish to move at an appropriate time to have that portion of the statement redacted, to preserve the record. I will allow the evidence to come in; the entire statement, with a limiting instruction to the jury, because I share your concern, * * * and we need to sanitize as much as possible that evidence about possession of a gun. We need to isolate the impact of that evidence for the jury."

3. When she denied the motion, the trial justice further stated:
> "I will, however, allow counsel to state reasons for the record at a later time, and I will spread on the record my reasons for overruling your objection. But, bear in mind that I will caution the jury that the information contained in the last para-

Later at trial, Detective Corporal Lawrence Skelton (Det. Skelton) of the East Providence Police Department testified over defense counsel's objection that a .32 caliber Davis Industry semiautomatic handgun was turned over to him during a search of defendant's bedroom. He further testified that "[a]long with that gun was the clip for the gun, which contained six bullets, and there was also a box of ammunition which contained forty-four bullets." At that time, the trial justice made the following statement to the jury:

> "Members of the jury, you will recall that, earlier, in one of the statements made a full exhibit in this case, the statement made mention of a firearm, and I said evidence of that comes in for a limited purpose. * * * It doesn't come in, for example, to show you that a person who owns a gun must be a bad person and that therefore is likely to be guilty. That is not the point of this evidence. And, at the close of the case, I will again remind you that evidence about the gun is in this case for a different purpose, and the attorneys will argue to you in their summations."

In his closing argument, in an effort to persuade the jury that defendant's fourth statement was knowingly and voluntarily made, the prosecutor mentioned defendant's disclosure that a firearm was located in his bedroom.[4] Thereafter, in her

graph, that information has a limited purpose. After you've heard it, I'll call it to your attention."

4. The relevant portion of the prosecutor's closing remarks are as follows:
> On July 2nd, when he speaks to the police, it's here again just how focused he is. He tells the police in that statement 'Get the gun out of my house. I know, because of the nature of these charges, that I shouldn't have it, and my mother doesn't want me to have it. The keys are in the bottom of a cup with some pens in it in my bedroom.' Lo and behold, the police go there that day, and what do they find? Keys in the bottom of the cup where the pens are, and the gun in the locked video case, where the defendant said it would be within his bedroom."

final charge to the jury, the trial justice again instructed the jury to only consider the evidence relating to the gun for purposes of determining defendant's state of mind at the time he made the statement.[5]

On appeal, defendant argued that the trial justice erred in denying his motions to redact from his fourth statement any reference to the gun in his bedroom and to exclude the testimony of Det. Skelton that the police had in fact located a gun in his bedroom. He argued that the evidence relating to the gun was unnecessary and prejudicial, and therefore should have been excluded under Rule 403 of the Rhode Island Rules of Evidence.[6]

■ Relevant evidence is evidence that tends "to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." R.I. R. Evid. 401. Further, it is well settled that questions concerning the admissibility of evidence on the grounds of relevancy are left to the sound discretion of the trial court, and this Court will not disturb such a ruling absent a clear abuse of discretion that results in prejudice to the defendant. *See State v. Gabriau,* 696 A.2d 290, 294 (R.I.1997).

■ The defendant argued that although the gun evidence may have been relevant to the state's burden of demon-

strating the voluntariness of the statements given by defendant, it nonetheless should have been excluded under Rule 403 because its prejudicial effect substantially outweighed its probative value. However, it is the state that had the burden of proving the voluntariness of defendant's four statements.[7] In light of defendant's claims that his will was overborne from physical and mental exhaustion at the time he made the statements (and that therefore his statements were not voluntary), the trial justice reasoned that the only relevance of the gun evidence was for the state to show the defendant's state of mind when he gave the fourth statement to the police. Moreover, the jury was instructed extensively to consider the evidence only for the limited purpose of determining defendant's state of mind at the time he gave the statement to the police. We therefore conclude that the admission of the gun evidence for the limited purpose of demonstrating that the defendant was alert at the time he made the fourth statement to the police was not an abuse of discretion.

## II

## Jury Instructions

■ As previously noted, defendant challenged, at trial, the voluntariness of his signed, written statements to the police.

---

5. The relevant portion of the trial justice's final instructions to the jury is as follows:
 "There was also evidence introduced in this case which came in for a limited purpose. And that was evidence that the defendant, according to the State's exhibit, told the police officer about a firearm that was located in his bedroom, and I said it doesn't come in for the purpose of showing you that he's a bad person who has a gun and is probably guilty of this crime. It was not the purpose of that. That evidence came in on the issue that related to the defendant's state of mind at the time he was making his statements to the police."

6. Rule 403 of the Rhode Island Rules of Evidence provides:
 "**[Exclusion] of relevant evidence on grounds of prejudice, confusion, or waste of time.**—Although relevant, evidence may

be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence."

7. The "humane practice" rule affords a defendant the privilege of attacking the voluntariness of his confession on a legal basis before a trial justice and then again in his presentation to the jury. *See State v. Ducharme,* 601 A.2d 937, 942 (R.I.1991); *State v. Killay,* 430 A.2d 418, 421 n. 2 (R.I.1981). The defendant in this case made such an attack on the voluntariness of the statements to the police; therefore, it was incumbent upon the state to prove that the statements were voluntary in order to overcome defendant's attack.

Under the humane practice rule in this state, when such a challenge is made by a defendant, the trial justice must make a preliminary determination, as a matter of law, as to the voluntariness of the confession before submitting the question to the jury for its own determination. *See State v. Marini*, 638 A.2d 507, 517 (R.I.1994); *State v. Killay*, 430 A.2d 418, 421 (R.I. 1981); *State v. Mariano*, 37 R.I. 168, 187, 91 A. 21, 29 (1914). Further, the jury is to be instructed prior to deliberations that it must find by clear and convincing evidence that the defendant's confession was voluntary, and that defendant had been advised of his constitutional guarantee against self-incrimination (the *Miranda* Rights so-called), before the jury may consider the statement as evidence. *See id.*

■■ In the case at bar, the trial justice gave detailed instructions relative to the jury's function to determine voluntariness as a question of fact.[8] On appeal, defendant has questioned the adequacy of that jury instruction. After a review of the instruction in its entirety, we are satisfied that the trial justice provided the jury with more than adequate information to enable it to determine those facts that bore on the voluntariness of defendant's statements. *See State v. Ducharme*, 601 A.2d 937, 943

(R.I.1991). Specifically, the trial justice properly and accurately instructed the jury concerning the issue of when a defendant can be found to be in custody, thus triggering the panoply of rights attendant to a custodial interrogation. Therefore, we conclude that the trial justice's instructions to the jury were adequate and thorough in light of the inherent complexity presented by this unique factual situation.

## III

### Enlarged Photographs

Before trial, defendant moved to exclude enlarged versions of photographs of Kendra's body taken at the murder scene and at the medical examiner's office on the basis that the enlargements, which measured approximately twelve by seventeen inches, were no more revealing than the four-by-six originals and were being offered solely to inflame the passions of the jurors.[9] The state countered that the enlarged photographs would assist the medical examiner in her presentation to the jury. After examining the enlarged photographs and the corresponding originals, the trial justice admitted the enlargements, finding that they would not create undue prejudice and they would enable the

8. A portion of the trial justice's final charge to the jury relating to the voluntariness issue is as follows:

"When a person is in custody and the focus of a criminal investigation, in that circumstance, the person must first be informed in clear and unequivocal terms that he has a right to remain silent, that anything he says will be used against him, and that he has a right to an attorney, and, if he can't afford one, one will be appointed for him, and to have the attorney with him during questioning. The defendant must be told at the same time that if he wished to talk, he may, but that he is at liberty to stop at any time and decline to continue. Now, it is the State's burden to prove by clear and convincing evidence that these warnings were clearly given to the defendant, and the State must prove that the defendant voluntarily, knowingly and intelligently gave up his or her privilege against self-incrimination and his or her right to have

an attorney. Now, when I say that the State must prove that this was a voluntarily-made statement or admission, voluntary means not constrained, not impelled nor influenced by another; means done of one's own free will. Knowingly means with awareness, with deliberateness. Intelligently means having or indicating a satisfactory degree of mental capacity or powers of perception sufficient to enable that person to perceive and to understand what's going on. And, so, before you can take the defendant's admissions or statements as evidence, you must first be convinced by clear and convincing evidence that the defendant was informed of his rights, as enumerated in the rights form, that these rights were given up by the defendant, and that the defendant voluntarily made his statements."

9. Although they were referred to as "3 by 5" photographs at trial, we note that the original photographs measured approximately four-by-six inches.

medical examiner to testify more clearly about Kendra's wounds, and in fact were essential to enhancing the jury's comprehension of such testimony. On appeal, the defendant alleged error on the part of the trial justice in permitting the state to introduce the enlarged photographs.

■ This Court has consistently held that "[i]t is within the trial court's discretion to determine the materiality or relevance of photographs." *State v. Bettencourt*, 723 A.2d 1101, 1108 (R.I.1999) (quoting *State v. Rivera*, 640 A.2d 524, 526 (R.I.1994)); *see also State v. Correia*, 600 A.2d 279, 284 (R.I.1991). This Court's function on appeal "is to review the record and to determine whether the trial justice carefully considered whether the probative value of the evidence was outweighed by undue prejudice, 'keeping in mind that even if the evidence offered is of a gruesome nature and might tend to influence the jury unduly, it may nevertheless be admissible if it is otherwise material and competent.'" *State v. Griffin*, 567 A.2d 796, 801 (R.I.1989) (quoting *State v. Ware*, 524 A.2d 1110, 1113 (R.I.1987)).

■ There is nothing appealing about a brutal homicide committed by the infliction of numerous chopping wounds and striking blows to the face and head. In *Bettencourt*, we recognized that photographs are admissible in criminal cases "for numerous reasons, such as displaying the extent of the injury or identifying the body and its condition." 723 A.2d at 1108 (quoting *Correia*, 600 A.2d at 285). "Thus, '[p]hotographs that are faithful representations of the victim at the time in issue are admissible in the court's discretion.'" *Bettencourt*, 723 A.2d at 1108 (quoting *State v. Beauchamp*, 671 A.2d 1238, 1241 (R.I. 1996)). Therefore, the "test is whether the photograph is 'of such a nature as to inflame the jurors and therefore prejudice them beyond the ordinary prejudice that is always sustained by the introduction of relevant evidence intended to prove guilt.'" *Beauchamp*, 671 A.2d at 1241

(quoting *State v. Fenner*, 503 A.2d 518, 526 (R.I.1986)).

■ When considering the defendant's motion to limit the admission of the enlarged photographs, the trial justice stated that "[a] comparison of the 3 × 5 and its counterpart in the enlargement, 12 × 17, makes it clear to me that the photographs, as they are enlarged, will enable the medical examiner to testify more clearly as to the wounds on the body." Further, the trial justice summed up her finding of relevancy by stating:

"That's the reality. The reality is how the woman died. Photographs of it are essential to better understanding of the testimony, and I don't think they are prejudicial or designed in any way whatsoever to let this jury run away with its emotions. I think it was a professional decision to enlarge them to enhance our understanding of the testimony."

We agree with the reasoning enunciated by the trial justice and are satisfied that she carefully considered whether this evidence would inflame the passions of the jurors or cause undue prejudice. We therefore conclude that the trial justice did not abuse her discretion in allowing the introduction of the enlarged photographs into evidence.

## IV

### Sentencing

■ Because this case involves the imposition of a sentence of life without the possibility of parole, it is incumbent upon this Court to exercise its own independent judgment and discretion in determining the appropriateness of the sentence. *See State v. Travis*, 568 A.2d 316 (R.I.1990); *State v. Lassor*, 555 A.2d 339 (R.I.1989). To make such a determination, this Court shall examine the record, the findings of the trial justice, and the personal character, record, and propensities of the defendant. *State v. Wilson*, 568 A.2d 764, 769 (R.I.1990).

On November 30, 1994, the state, pursuant to § 11–23–2(4) and G.L. 1956 §§ 12–19.2–1, 12–19.2–2, and 12–19.2–3, gave timely notice to defendant of its intent to recommend a sentence of life imprisonment without the possibility of parole. Immediately after the jurors returned the verdict of guilty of first-degree murder, the trial justice requested that they return to the jury room to determine, beyond a reasonable doubt, whether the murder was "committed in a manner involving torture or aggravated battery to the victim." Section 11–23–2(4). After further deliberations, the jury returned with a unanimous answer in the affirmative.

At the presentence hearing on May 5, 1997, the trial justice was presented with and carefully considered the testimony of Kendra's sister, Audrey Cote, and the defendant's mother, Teresa Tassone; a letter written by Kendra's husband, Chris Hutter; a letter written by the defendant; arguments by counsel for both parties; a psychiatric evaluation of defendant by James A. Gallo, M.D.; and a statement by defendant.[10] Thereafter, the trial justice imposed the sentence of life without the possibility of parole. We feel it is appropriate to include in our decision today the particularly telling words of the trial justice during her imposition of the sentence:

> "I think it is beyond question that Kendra Hutter's murder was a monstrous and brutal crime. It virtually beg[s] description. The killing of that woman involved—and this is based on photographic evidence and medical evidence—incalculable pain. And I

think the jury correctly saw this death to be the result of almost unparalleled savagery by one human being on another. .

\* \* \*

"Bear in mind, as the Court refers to the injuries to the victim, that the weapon used was a heavy shovel with a U-shaped blade that almost came to a point.

"This victim, as the State has pointed out, suffered at least fifteen to seventeen blows to her body with that weapon. She defended with her forearms and hands some eight, nine or ten of those blows. In fact, one of the blows broke one of her fingers.

"The medical examiner also pointed out that seven chopping blows struck and severely disfigured the victim's face. In fact, the testimony of the medical examiner revealed one of those chopping, slashing blows fractured the victim's skull and actually lacerated her brain. Another blow broke her jaw. And she was denied the blessing of instant death because the medical examiner told us that for some time, perhaps as long as fifteen minutes, this victim was alive but helpless.

"Now, it is true that the defendant has no prior criminal record. I will accept that he has displayed kindness to his neighbors and kindness to his family, but the true measure of this defendant's character and propensities is what he did to that victim. That was the act of a vile and despicable person. This is virtually a demonic way of dealing with

---

10. General Laws 1956 § 12–19.2–4 provides:
"**Consideration of aggravating and mitigating circumstances.**— At the presentence hearing, following a finding that one or more of the circumstances enumerated in § 11–23–2 or 11–23–2.1 as the basis for imposition of a sentence of life imprisonment without parole was involved in the first degree murder of which the defendant has been convicted, the court shall consider evidence regarding the nature and circumstances of the offense and the personal his-

tory, character, record, and propensities of the defendant which are relevant to the sentencing determination. After hearing evidence and argument regarding the aggravating and mitigating circumstances relating to the offense and the defendant, the court shall, in its discretion, sentence the defendant to life imprisonment without parole or to life imprisonment. The court shall state on the record its reasons for imposing its sentence."

another human being, and despite the monstrous nature of what happened, we have a defendant whose character makes him utterly remorseless.

"A jury decided that this defendant was not worthy of belief. The jury decided that he took the stand and he lied, and he had all the indicia of a liar. Focused, even as he is today, in a kind of whining, self-pitying, self-involved way. This Court did not even get a sense that he was truly compassionate to his daughter or his mother.

❋ ❋ ❋

"This is a defendant whose character and propensities convince this Court that he'll never change from the completely evil person that he is. He does not admit even to himself how monstrous that crime was.

"There is nothing in the record, not a hint, that giving you the right to be eligible for parole will serve either you or society. And to respond to the kind of crime this defendant committed, the atrocious nature of what he did, and to respond to the kind of person he is, there is only one sentence this Court is going to impose.

"And so, Mr. Tassone, because of the viciousness and the brutality with which you hacked your victim to death, this Court now sentences you to life in prison without possibility of parole."

On appeal, defendant argued that the imposition of a life sentence without the possibility of parole, the most severe sentence authorized by Rhode Island law, was unwarranted in his case, and requested that we reduce his sentence to life with the possibility of parole. We disagree. It is obvious that the trial justice, when confronted with a first-time offender found guilty of a particularly gruesome and heinous murder, carefully considered the nature of the offense and the personal character and propensities of the offender, and concluded that Tassone will "never change from the completely evil person that he is." We agree with this assessment.

After careful review of the facts of this case, we are satisfied that in light of the horrific nature of this crime, the trial justice was well within her discretion in imposing the sentence of life imprisonment without the possibility of parole.

## CONCLUSION

For these reasons we deny the defendant's appeal and affirm the judgment of conviction. The papers of the case may be remanded to the Superior Court.