March 19, 2026

**Supreme Court**

No. 2021-314-M.P.
(PM 00-4624)

Gary Tassone                    :

v.                              :

State of Rhode Island.          :

NOTICE:    This opinion is subject to formal revision before publication in the Rhode Island Reporter.  Readers are requested to notify the Opinion Analyst, Supreme Court of Rhode Island, 250 Benefit Street, Providence, Rhode Island 02903, at Telephone (401) 222-3258 or Email:    opinionanalyst@courts.ri.gov,    of    any typographical  or  other  formal  errors  in  order  that corrections may be made before the opinion is published.

Gary Tassone                          :

v.                          :

State of Rhode Island.                          :

Present:  Suttell, C.J., Goldberg, Robinson, Lynch Prata, and Long, JJ.

## O P I N I O N

**Justice Goldberg, for the Court.**  The petitioner, Gary Tassone (petitioner or Tassone), seeks review of a Superior Court judgment denying his application for postconviction relief.  On certiorari, Tassone challenges the second postconviction-relief trial justice's determination that certain actions taken *vel non* by his trial counsel did not constitute ineffective assistance of counsel.  For the reasons discussed, we reject Tassone's arguments and affirm the judgment of the Superior Court.  Although our opinions in *State v. Tassone*, 749 A.2d 1112 (R.I. 2000) (*Tassone I*), and *Tassone v. State*, 42 A.3d 1277 (R.I. 2012) (*Tassone II*), provide additional context, we recite the relevant facts.

## Background and Travel

On June 30, 1994, a woman and her two young nephews were strolling Crescent Beach in Riverside, Rhode Island, searching for seashells and sea glass. After they had collected some treasures, the mid-morning beach excursion abruptly and traumatically ended upon the discovery of what appeared to be a human arm protruding from the sand. Sadly, her suspicion was confirmed.

The young woman promptly notified the East Providence Police Department, and within minutes officers began converging upon the scene. Soon, the medical examiner arrived and carefully unearthed a female body from a shallow grave measuring a depth of approximately one and a half feet. The then-unidentified decedent was wearing a red satin-like dress, a matching jacket, white nylon stockings, and black high heels. Nearby, a Misty brand cigarette butt and a Dunkin' Donuts beverage cup containing partially consumed coffee was discovered. The burial site was encircled with piles of sand measuring approximately ten feet in diameter.

The medical examiner later described the injuries: They were brutal. The decedent suffered three severe chopping wounds to the right eye, including one that perforated the skull and penetrated the brain; four less severe chopping injuries to the right side of the face; blunt force trauma to the forehead; a broken finger; and numerous injuries to the back of the arms and forearms, characterized as defensive

wounds. As a result of additional injuries, the medical examiner opined that "a sexual-type assault may have taken place." In total, the decedent suffered at least fifteen physical injuries and lay helpless, bleeding, and dying for as long as fifteen minutes. A murder weapon was not discovered at the crime scene; but based solely upon the preliminary observations made at the beach, the medical examiner suggested that the injuries were inflicted by "an ax, a hoe, [or] a shovel * * *." She estimated that death occurred on June 29, 1994, between 11 p.m. and midnight.

Around the time the events at Crescent Beach were unfolding, Christopher Hutter (Christopher),[1] a resident of Pawtucket, Rhode Island, reported that his estranged wife (with whom he resided along with their two children) was missing. *See Tassone I*, 749 A.2d at 1114. Detective Corporal Arthur Clark (Det. Clark) of the East Providence Police Department learned about the missing-person report and soon realized that the woman described in the alert was last seen dressed in a manner that was similar to the unidentified decedent. After driving to Pawtucket and meeting with officers from that city, Det. Clark was shown a photograph of thirty-year-old Kendra Hutter (Kendra); he identified her as the decedent. The murder would be solved promptly.

---

[1] For the sake of clarity, we refer to Christopher Hutter by first name to distinguish him from his estranged wife, the decedent, Kendra Hutter, whom we also reference by first name. We intend no disrespect.

Detective Clark interviewed Christopher and he explained that the previous evening (June 29), at approximately 9 p.m., Kendra left home for a date. Christopher advised that as Kendra departed, he inquired concerning her whereabouts and in response, she handed him a card. The card was inscribed by Kendra and contained the name "Gary" and included a telephone number. Christopher further recounted that earlier that day (June 30), in an apparent effort to locate Kendra, he called the telephone number associated with Gary. According to Christopher, Gary relayed that he had not seen Kendra since June 28, 1994.

In the early evening hours of July 1, 1994, Det. Clark, accompanied by Detective Corporal Kenneth Bilodeau of the East Providence Police Department (Det. Bilodeau), went to the home address corresponding with the telephone number on the card. There, Dets. Clark and Bilodeau encountered Tassone, and they advised him that Kendra was deceased. After conversing for approximately twenty minutes, Det. Clark requested that Tassone provide a statement at the police station. Tassone agreed, and he followed the detectives in the family vehicle. Upon arrival, Tassone walked into the police station unassisted, unsearched, and unrestrained in all respects, and once seated in a chair adjacent to Det. Clark's desk, he answered questions concerning the evening of June 29, 1994. In light of our previous recognition that petitioner's "own statements to the police were the most damaging

- 4 -

evidence against him," we recount in detail the evolving, contradictory, and inculpatory statements. *Tassone II*, 42 A.3d at 1284.

On July 1, 1994, at 7:55 p.m., petitioner provided the first statement.[2] He admitted knowing "a girl named Kendra" and indicated that he

> "was supposed to meet Kendra on June 29, 1994 at her house. This was supposed to be at 9:30 PM. * * *
>
> "On June 29, Kendra called me and told me she had an engagement that evening and had to cancel. She called me from work because I heard a lot of noise in the background. That was the last I heard from her."[3]

Tassone further related that he last saw Kendra on June 22, 1994.

---

[2] We have made minor punctuation changes to all four statements, *viz.*, eliminating extra spaces and extra punctuation marks. All other alterations are appropriately noted.

[3] At trial, Christine Langlais, a manager at a McDonald's Restaurant, where Kendra was employed, testified. Langlais related that on the evening of June 29, 1994, Kendra was working and requested to leave early because she had a date. Langlais further recounted that during her shift, Kendra made a telephone call to confirm the date. According to Langlais, Kendra completed her shift early—between 8:15 p.m. and 8:30 p.m.—and changed from her work uniform into a red dress, white nylons, and black heels.

During the defense case, Theresa Tassone, petitioner's mother, testified. She relayed that after arriving home from work on June 29, 1994, she retrieved a message from the answering machine left for Gary from a woman named Kendra canceling their date for that evening. Despite knowing since July 2, 1994, that her son had been charged with Kendra's murder (and incarcerated), the record demonstrates that Ms. Tassone did not tell anyone about this potentially exculpatory evidence that could have absolved her son of a murder charge until the morning of her testimony on January 27, 1997. As an explanation for the delayed reporting, Ms. Tassone testified "I just forgot about it."

- 5 -

After memorializing petitioner's account, Det. Clark advised Tassone to read the statement, make any corrections, and sign it. Tassone complied, and he amended the statement to include two or three additional sentences that are not particularly germane to this matter. Detective Clark testified that during this encounter, petitioner seemed calm, appeared to comprehend the questions, and provided responsive answers.

Thereafter, Det. Clark reviewed the first statement and perceived several discrepancies between petitioner's account and information gleaned during the investigation. Specifically, Det. Clark noted that during questioning Tassone recounted that he last saw Kendra on June 22, but he had earlier told Christopher that he last saw Kendra on June 28. Both versions, Det. Clark further observed, conflicted with Christopher's account that when Kendra departed on the evening of June 29, 1994, he inquired of her plans and she furnished petitioner's contact information. Based, at least in part, upon the conflicting nature of this critical information, Dets. Clark and Bilodeau agreed that Tassone was now a suspect in Kendra's murder. Accordingly, Det. Clark advised petitioner of his constitutional rights, instructed him to read and initial each enumerated right, and further, if he understood those rights, to sign the document. During the postconviction-relief hearing, Tassone admitted that at 8:50 p.m., he signed the form.

After declining to invoke his constitutional rights, at 10:45 p.m., Tassone furnished a second statement:

> "At this time I would like to add a few things to the statement I have just given to Det. Cpl. Clark.
>
> "I did see Kendra on the night of Wednesday, 7-29-94.[4]
>
> "* * *
>
> "[W]e drove to Riverside down to the side street which goes to the beach. I parked and we walked down the beach for about 100 yards. I had a blue color blanket and we put it down on the beach and had intercourse. We were there for only 20 minutes. We then walked back to my car.
>
> "I drove around with Kendra and let her out at her home in Pawtucket at about 11:15-11:20 P.M. I then drove back to my house. That was the last time I saw Kendra."

Tassone signed the second statement.

Approximately one hour later, at midnight, Tassone delivered a third statement:

> "After speaking with Det. Bilodeau a short time ago I wish to state at this time that while I was at the beach in Riverside with Kendra something else took place.
>
> "The blanket we had used first of all was white and not blue. * * *

---

[4] Detectives Clark and Bilodeau both testified that the reference to July 29, 1994, was a typographical error. The intended date was June 29, 1994. It is axiomatic that on the date the second statement was created (July 1, 1994), the date associated with the scrivener's error (July 29, 1994) was in the future.

> "We were on the beach for about an hour and were having fun together. I got a shovel from my car and we started building sand castles. By mistake I got sand in Kendra's face. It was OK and wasn't done on purpose. Kendra didn't get mad so we continued having fun together.
>
> "Anyway she was about two feet from me and I had the shovel in my hand. Something jumped in the woods near me and scared me. I didn't know if it was an animal or what.
>
> "I swung the shovel at the sound but hit Kendra in the face. She fell to the ground and was bleeding. I was scared I killed her. I used the shovel to cover her up with sand so nobody would know.
>
> "I guess she was still alive because her hands came up and out of the sand. I took the blanket and the shovel and ran to my car. I then drove off and got onto Rt. 195 East toward Seekonk, Mass. Just over the state line I stopped my car and tossed out the blanket and shovel off the side of a small bridge. I then drove home."

The petitioner signed the third statement, and in so doing, testified at trial that he "realized what I was signing * * *." Thereafter, petitioner visited with his mother and was taken into custody.

The next morning, July 2, 1994, at approximately 10 a.m., Tassone awoke. The petitioner was again read his constitutional rights, and asked to read, initial, and sign the form. Tassone did so, and at 11:15 a.m., he provided the fourth and final statement, which we recount in detail:

> "Today Det. Bilodeau of the East Providence Police Department spoke with me about this investigation. He read me my rights again and I then read the form. I signed

because I understood my rights and wish to further speak with Det. Bilodeau.

"Det. Bilodeau and Det. Clark have offered me food and drink. I am not hungry at this time and told them no. They are not holding food or rest from me and they let me sleep until about 10:00 A.M. this morning.

"I wish to continue with what has been told to police at this time.

"* * *

"Kendra was wearing a bright red dress with black shoes and white nylons. We didn't make plans to go anywhere she just got dressed up because she felt like it.

"We picked up some Dunkin['] Donuts [c]offee in the center of East Providence before we went to the beach. I tossed my empty cup near where we parked the car off to the right in some bushes. Kendra took her cup with her and it was left near where she was buried on the beach.

"After we left the road and got on the beach we at first walked to the right but the sand was kind of wet over there. Kendra asked me to get the blanket from my car so we could have sex. I did and then we walked to the left of the road where the sand seemed dry. We talked about doing something romantic. I suggested using my shovel. She said sure.

"I had taken a shovel out of my trunk and took it and the blanket with us onto the beach.

"The reason I took the shovel was because I wanted to do something special for Kendra. I laid the blanket out in the sand and started to make a circle around the blanket. She asked what I was doing and I told her I just wanted to build a circle around us. * * *

- 9 -

"* * *

"I was on one knee. Kendra was just to my left on both knees. At this time I was scared by the crash in the woods and swung the shovel which hit Kendra in the head. I then buried her where I had been digging. Again I think she was still alive because her hands came up and out of the sand. I was in panic and scared to death. I wanted to get out of there and ran.

"* * *

"I put both the shovel and the blanket in the trunk of my car. I then drove into East Providence and ended near the Showcase Theater in Seekonk, Mass. I took the Rt. 195 West exit there and stopped on 195 West just before the bright lights on the state line. I stopped and threw the blanket and the shovel off the side of the road."

Tassone signed the fourth statement.

Detective Bilodeau testified that after delivering the fourth confession, petitioner and multiple officers proceeded onto Route 195 in an effort to locate the discarded shovel and blanket. Shortly after driving across the Massachusetts/Rhode Island border, Det. Bilodeau recounted that petitioner directed the officers to stop, whereupon he pointed and exclaimed, "There, there. That's the spot. * * * That large willow tree; that's where I put the items." The shovel and blanket were discovered in the vicinity of the willow tree. During the investigation, the police further learned that on the evening of June 29, 1994, Tassone was driving a maroon-colored Chrysler New Yorker.

- 10 -

Tassone was indicted and charged with one count of murder in violation of G.L. 1956 § 11-23-1. *See Tassone I*, 749 A.2d at 1115. Prior to trial, Tassone moved to suppress the confessions on the basis that they were obtained in violation of his constitutional rights. An evidentiary hearing ensued during which Dets. Clark and Bilodeau, as well as petitioner and his mother, testified. The trial justice denied the motion to suppress, concluding that at the time the first statement was offered, petitioner was not in custody, and therefore was not entitled to the panoply of rights attendant to a custodial interrogation. The trial justice added that Tassone

> "seemed educated when he was on the witness stand, articulate, knowledgeable, and that's how he struck both detectives. He was alert to his surroundings. He was appropriately responsive. * * * He was not withdrawn. He was not veiled in fear. He wasn't traumatized by the situation he was in. He was totally together. I think the record is quite clear. He was able to read. He understood English. * * * [H]e was asked to sign [the first rights form] if he agreed that he had been advised of his rights and understood them, and he did in fact sign it."

The trial justice further recognized that there was conflicting testimony concerning whether petitioner sought to terminate questioning and requested an attorney. After making this observation, the trial justice concluded that Tassone's version of events "was altogether at odds with the clearly more credible explanation given by the detectives." She elucidated:

> "This [c]ourt is more than satisfied, if I were to use the beyond a reasonable doubt standard, which I don't have to use on this motion -- this [c]ourt is convinced beyond a

- 11 -

reasonable doubt that he was advised at the point where he needed to be advised, that he was capable of understanding, that he voluntarily abandoned those rights, that it was a knowing, intelligent abandonment of those rights, his will was never overborne, he had a capacity for self-determination all through the questioning by the police, and that [the] mere request to talk to his mother or see his mother was not enough to indicate that he was invoking any right to remain silent. He was composed all through the questioning. There was no evidence of any kind, from the totality of circumstances, that his statements were other than the product of a free will and a clear mind."

Consistent with the humane practice rule, the trial justice further recognized that the voluntariness of petitioner's confessions would be submitted to the jury.[5]

During trial, Tassone's testimony was completely at odds with his prior statements. He testified that he was not with Kendra on the evening of June 29, 1994; he did not guide the officers to the shovel and blanket discarded off Route 195; and the inculpatory statements attributed to him largely represented Det. Bilodeau's accounting. In sum, Tassone generally insisted that certain information on both constitutional rights forms had been altered, that the statements were not his,

---

[5] "The 'humane practice' rule affords a defendant the privilege of attacking the voluntariness of his confession on a legal basis before a trial justice and then again in his presentation to the jury." *State v. Tassone*, 749 A.2d 1112, 1117 (R.I. 2000) (*Tassone I*). As we previously observed, Tassone "made such an attack on the voluntariness of the statements to the police; therefore, it was incumbent upon the state to prove that the statements were voluntary in order to overcome defendant's attack." *Id.* The trial justice provided multiple instructions to the jury consistent with the humane practice rule.

were obtained in violation of his constitutional rights, and that he complied with the process based upon the detectives' assurances that this was "how the system works."

On January 28, 1997, Tassone was convicted of first-degree murder. In so doing, the jury necessarily determined that Tassone's confessions were knowingly and voluntarily procured. Immediately thereafter, the trial justice instructed that the jury answer a supplemental interrogatory; specifically, "Did [Tassone] murder Kendra Hutter in a manner involving either torture and/or aggravated battery?"[6] The jury unanimously responded in the affirmative, and the trial justice sentenced Tassone to life imprisonment without the possibility of parole. *See Tassone I*, 749 A.2d at 1115; G.L. 1956 § 12-19.2-4. More than a quarter-century later, the trial justice's sentencing remarks continue to resonate:

> "[I]t is beyond question that Kendra Hutter's murder was a monstrous and brutal crime. It virtually begs description. The killing of that woman involved—and this is based on photographic evidence and medical evidence— incalculable pain. And I think the jury correctly saw this

---

[6] The trial justice instructed the jury that "aggravated battery" was defined as

> "the malicious causing of bodily harm to the victim before her death, either by depriving her of a member of her body -- that's depriving a person of an arm or a leg -- or by rendering a member of her body useless, or by seriously disfiguring her body or a member thereof. That is the definition of aggravated battery."

The trial justice instructed that "[t]orture" was defined as "serious physical or mental abuse of the victim while she remained alive and conscious."

- 13 -

> death to be the result of almost unparalleled savagery by one human being on another.
>
> "* * *
>
> "A jury decided that [Tassone] was not worthy of belief. The jury decided that he took the stand and he lied, and he had all the indicia of a liar." *Tassone I*, 749 A.2d at 1120-21 (brackets omitted).

On April 27, 2000, this Court affirmed petitioner's direct appeal. *See id.*

After *Tassone I*, petitioner filed an application for postconviction relief (the application). *See Tassone II*, 42 A.3d at 1280. Notwithstanding the absence of a postconviction-relief evidentiary hearing and trial transcripts, a justice of the Superior Court (first postconviction-relief trial justice) denied the application. *Id.* at 1283, 1285. On appeal, we vacated the judgment of the Superior Court and concluded that petitioner was entitled to an evidentiary hearing. *Id.* at 1287.

Following the remand, a justice of the Superior Court (second postconviction-relief trial justice) conducted an evidentiary hearing, during which Tassone testified. Significantly, neither petitioner nor the state presented additional witnesses. On October 22, 2021, the second postconviction-relief trial justice issued a comprehensive fifty-three-page decision, denying the application. We granted Tassone's petition for a writ of certiorari.[7]

---

[7] Our review of the trial transcript reveals that pages 146, 264-300, and 990-91 are missing. The omission of these pages does not affect our review, nor has either party raised this issue. Page 146 contains Det. Bilodeau's suppression-hearing testimony

- 14 -

Additional relevant facts will be set forth as necessary.

## Standard of Review

"A party aggrieved by a final judgment entered in response to a postconviction-relief application may seek review by filing a petition for writ of certiorari." *Lefebvre v. State*, 313 A.3d 1156, 1162 (R.I. 2024) (quoting *Atryzek v. State*, 268 A.3d 37, 41 (R.I. 2022)). "This Court will not disturb a trial justice's factual findings made on an application for post-conviction relief absent clear error or a showing that the trial justice overlooked or misconceived material evidence in arriving at those findings." *Rivera v. State*, 316 A.3d 683, 695 (R.I. 2024) (brackets omitted) (quoting *Santos v. State*, 91 A.3d 341, 344 (R.I. 2014)). "We will, however, review *de novo* any post-conviction relief decision involving mixed questions of law and fact pertaining to an alleged violation of an applicant's constitutional rights." *Id.* (quoting *Santos*, 91 A.3d at 344).

---

and pages 990-91 contain the trial testimony of Tassone's mother. The trial testimony begins on page 316. It is unclear what is contained within pages 264 through 300. As this Court has noted on numerous occasions, it is petitioner's responsibility to furnish a complete transcript. *See Riley v. Stone*, 900 A.2d 1087, 1093-94 (R.I. 2006); *see also Tassone v. State*, 42 A.3d 1277, 1281 n.3 (R.I. 2012) (*Tassone II*) (noting petitioner's in-court claim that his copy of the trial transcript had been destroyed in a flood, but later recanting, acknowledging the fabrication, and stating "the originals are in my possession").

**Analysis**

When evaluating a claim of ineffective assistance of counsel, "[t]his Court adheres to the standard set forth by the United States Supreme Court in *Strickland v. Washington*, 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984) * * *." *Rivera*, 316 A.3d at 696 (quoting *Navarro v. State*, 187 A.3d 317, 325 (R.I. 2018)). "In order to prevail on a claim of ineffective assistance of counsel, an applicant must satisfy two criteria." *Id.* (quoting *Navarro*, 187 A.3d at 326). "The burden of proving, by a preponderance of the evidence, that such postconviction relief is warranted falls on the applicant." *Id.* at 695 (quoting *Navarro*, 187 A.3d at 325).

Tassone raises a bevy of issues and contends that the second postconviction-relief trial justice erred in denying the application alleging ineffective assistance of counsel. Specifically, petitioner argues that counsel's performance was ineffective because he failed to (1) present Linda Hazard, who was eleven years old at the time of the murder, as a witness; (2) litigate effectively issues relating to the statements; (3) challenge the blood evidence; (4) raise a third-party-perpetrator defense; (5) retain an expert in sand evidence; and (6) engage an investigator to examine the lighting conditions on Route 195. We reject petitioner's claims.

## Prong One of the *Strickland* Test

First, the applicant "must show that counsel's performance was deficient." *Strickland*, 466 U.S. at 687. "This requires showing that counsel made errors so serious that counsel was not functioning as the 'counsel' guaranteed * * * by the Sixth Amendment." *Id.* "This prong can be satisfied only by a showing that counsel's representation fell below an objective standard of reasonableness." *Rivera*, 316 A.3d at 696 (quoting *Navarro*, 187 A.3d at 326). "In our evaluation of counsel's performance, a strong presumption exists that an attorney's performance falls within the range of reasonable professional assistance and sound strategy." *Id.* (quoting *Navarro*, 187 A.3d at 326).

"In any case presenting an ineffectiveness claim, the performance inquiry must be whether counsel's assistance was reasonable considering all the circumstances." *Strickland*, 466 U.S. at 688. In this regard, the Supreme Court has warned that "[i]t is all too tempting for a defendant to second-guess counsel's assistance after conviction or adverse sentence, and it is all too easy for a court, examining counsel's defense after it has proved unsuccessful, to conclude that a particular act or omission of counsel was unreasonable." *Id.* at 689. Therefore, "[a] fair assessment of attorney performance requires that every effort be made to eliminate the distorting effects of hindsight, *to reconstruct the circumstances of*

- 17 -

*counsel's challenged conduct, and to evaluate the conduct from counsel's perspective at the time*." *Id.* (emphasis added).

In performing this analysis, the Supreme Court of the United States, as well as this Court, have distinguished a counsel's reasonable strategic or tactical judgments from less-informed unreasonable decisions. The Supreme Court explained:

> "[S]trategic choices made after thorough investigation of law and facts relevant to plausible options are virtually unchallengeable; and strategic choices made after less than complete investigation are reasonable precisely to the extent that reasonable professional judgments support the limitations on investigation. In other words, counsel has a duty to make reasonable investigations or to make a reasonable decision that makes particular investigations unnecessary. In any ineffectiveness case, a particular decision not to investigate must be directly assessed for reasonableness in all the circumstances, applying a heavy measure of deference to counsel's judgments." *Strickland*, 466 U.S. at 690-91.

Likewise, our precedent reveals efforts to recreate the circumstances of the challenged conduct, evaluate the performance from counsel's perspective, and determine whether a challenged act or omission represents a reasonable strategic judgment or an unreasonable decision.

For example, in *Lefebvre*, counsel testified during a postconviction-relief hearing concerning the circumstances surrounding the disclosure to the prosecution of potentially inculpatory medical records. *See Lefebvre*, 313 A.3d at 1164-65.

- 18 -

Based upon counsel's candid testimony, we determined that the disclosure was "tactical but uninformed"; and we thus opined that counsel's performance represented "'objectively unreasonable' conduct." *Id.* at 1165 (quoting *Rice v. State*, 38 A.3d 9, 18 (R.I. 2012)); *see also Rivera*, 316 A.3d at 697 ("We emphasize that trial counsel's deficient advice did not stem from any strategic consideration, but from an unreasonable mistake of law as to the effect of the denial of the motion to dismiss.").

Relatedly, in *Rice*, the applicant challenged counsel's failure to call a medical expert during trial, as well as the decision to elicit testimony from two additional witnesses, both of whom ultimately rendered adverse testimony. *See Rice*, 38 A.3d at 13. At the postconviction-relief hearing, counsel testified concerning the rationale for these determinations, and with the benefit of that perspective, we concluded that counsel performed in a reasonably "tactical" or "strategic" manner. *See id.* at 13, 17, 18. Accordingly, we determined that the applicant failed to demonstrate that counsel's performance was objectively unreasonable. *Id.* at 17, 18 ("These were fathomably reasonable tactical choices for trial counsel to make in light of the evidence that had been presented against Rice during his trial.").

Here, Tassone failed to heed these instructions. To be sure, the record suggests that at the time of the postconviction-relief hearing, trial counsel maintained minimal recollection of the relevant events, but this consideration does not inure to

- 19 -

petitioner's benefit because the burden was upon him "to reconstruct the circumstances of counsel's challenged conduct" so that this Court could "evaluate the conduct from counsel's perspective at the time." *Strickland*, 466 U.S. at 689; *see also Rivera*, 316 A.3d at 695. On these decisive questions, the record is silent; petitioner presented neither trial counsel's sworn testimony nor other relevant evidence that informed the reconstruction of the circumstances surrounding the challenged conduct or counsel's perspective. *See Strickland*, 466 U.S. at 689. "Unlike a later reviewing court, the attorney observed the relevant proceedings, knew of materials outside the record, and interacted with the client, with opposing counsel, and with the judge." *Harrington v. Richter*, 562 U.S. 86, 105 (2011); *see also Massaro v. United States*, 538 U.S. 500, 505 (2003) ("If the alleged error is one of commission, the record may reflect the action taken by counsel but not the reasons for it."). Several examples properly illustrate this principle.

In one instance, Tassone charges that counsel performed in an objectively unreasonable manner when he failed to call as a trial witness Kendra's neighbor, Linda Hazard (Hazard). As an eleven-year-old, Hazard told police that on June 29, 1994, at approximately 9 p.m., she witnessed Kendra leaving her home in a white automobile with a man whom she did not identify as Tassone. While the record does not reflect the reason(s) Hazard was not called as a witness—a burden squarely within petitioner's responsibilities—the record demonstrates that counsel

- 20 -

thoroughly investigated Hazard's potential exculpatory value, *viz.*, counsel identified Hazard as a potential witness, directed a defense investigator to interview Hazard, and served Hazard with a trial subpoena. *See, e.g.*, *Wiggins v. Smith*, 539 U.S. 510, 522-23 (2003) ("[O]ur principal concern in deciding whether [counsel] exercised 'reasonable professional judgment' * * * is not whether counsel should have presented a mitigation case. Rather, we focus on whether the investigation supporting counsel's decision not to introduce mitigating evidence * * * was itself reasonable.") (brackets and emphasis omitted) (quoting *Strickland*, 466 U.S. at 691).

In this regard, the record reveals that Det. Clark testified that on the evening of June 29, 1994, Hazard "saw Kendra get into a white car." In light of this testimony, as well as the evidence that Tassone was driving a maroon-colored Chrysler New Yorker on the evening of June 29, 1994, it is unclear what additional exculpatory testimony Hazard could have offered. Detective Clark's testimony concerning Hazard's observation, and its potential effect on trial counsel's decision making, underscores petitioner's failure to recreate the circumstances surrounding the challenged conduct so that we may appropriately assess the reasonableness of counsel's actions. *See Strickland*, 466 U.S. at 689.

In another instance, petitioner faults trial counsel for neglecting to procure an expert to assist in understanding and contesting certain sand evidence, *viz.*, a prosecution expert witness testified that sand recovered from the trunk and the

driver's floor of the Chrysler New Yorker was "characteristic" of the sand found in Kendra's shallow grave. Although the record is clear that the defense did not present at trial an expert witness in sand evidence (it is less clear whether the defense procured an expert in sand evidence), petitioner has failed to elucidate the circumstances surrounding counsel's challenged performance or counsel's perspective. *See, e.g.*, *Roe v. Flores-Ortega*, 528 U.S. 470, 477 (2000) ("[C]ourts must 'judge the reasonableness of counsel's challenged conduct on the facts of the particular case, viewed as of the time of counsel's conduct' * * *.") (quoting *Strickland*, 466 U.S. at 690). Absent such a foundation, petitioner cannot satisfy his burden and demonstrate that counsel's performance was objectively unreasonable. *See Rivera*, 316 A.3d at 695.

The petitioner also claims that counsel performed ineffectively when he failed to highlight that certain evidence was inconsistent with his confessions. Tassone references the medical examiner's testimony that Kendra was buried with her arms protruding through the sand (in contrast to petitioner's statements that Kendra was buried alive) and his second statement that the blanket used on the evening of June 29, 1994, was blue (in contrast to petitioner's third statement and the evidence produced that the blanket was white). Because Tassone has utterly failed to reconstruct the events surrounding counsel's performance or his perspective, we have no basis whatsoever to evaluate the reasonableness of counsel's conduct. *See*

*Harrington*, 562 U.S. at 107 ("An attorney can avoid activities that appear 'distractive from more important duties.'") (quoting *Bobby v. Van Hook*, 558 U.S. 4, 11 (2009) (per curiam)).

While additional examples abound, these instances suffice to expose the fatal flaw in petitioner's *Strickland* argument; the record (including petitioner's appellate arguments) is silent concerning the efforts "to reconstruct the circumstances of counsel's challenged conduct, and to evaluate the conduct from counsel's perspective at the time." *Strickland*, 466 U.S. at 689. In the absence of such evidence, we simply have no basis to evaluate the reasonableness of counsel's challenged conduct. *See Yarborough v. Gentry*, 540 U.S. 1, 8 (2003) (noting the strong presumption that counsel exercised professional judgment "has particular force where a petitioner bases his ineffective-assistance claim solely on the trial record, creating a situation in which a court 'may have no way of knowing whether a seemingly unusual or misguided action by counsel had a sound strategic motive'") (quoting *Massaro*, 538 U.S. at 505). Thus, petitioner fails to satisfy his burden of demonstrating that the challenged conduct was objectively unreasonable.

**Prong Two of the *Strickland* Test**

In addition to satisfying the first prong, an applicant asserting ineffective assistance of counsel must also demonstrate "that the deficient performance prejudiced the defense." *Strickland*, 466 U.S. at 687. "This prong is satisfied only

when an applicant demonstrates that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Rivera*, 316 A.3d at 696 (quoting *Bell v. State*, 71 A.3d 458, 460 (R.I. 2013)). "A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Id.* (quoting *Strickland*, 466 U.S. at 694). In light of the record evidence, petitioner cannot satisfy this prong. Nonetheless, in the interest of completeness, we discuss why, even though petitioner fails to meet prong one, he also fails to satisfy prong two.

## A

### The Overwhelming Evidence of Guilt

Although Tassone suggests that he was prejudiced and denied the right to a fair trial due to counsel's ineffective performance, we have carefully reviewed the record and are satisfied that petitioner's own unfolding statements revealing intimate details of the crime scene and its aftermath sealed his fate. Previously we characterized petitioner's confessions as "the most damaging evidence against him * * *." *Tassone II*, 42 A.3d at 1284. Likewise, before this Court, petitioner acknowledges that "[t]he statements were the l[i]nchpin of the case" and constituted "the most powerful evidence the state had against [him]."

On July 1, 1994, at 7:55 p.m., petitioner admitted that he and Kendra initially had plans for the evening of June 29, 1994, but that Kendra had canceled the date.

- 24 -

After waiving his constitutional rights, at approximately 10:45 p.m., Tassone recanted and confessed that he and Kendra were together at Crescent Beach on the evening she was murdered, but he insisted that he had driven Kendra safely home. The latter portion of that statement was in obvious conflict with the location where Kendra's lifeless body was discovered. Approximately an hour later, at midnight, petitioner's account shifted yet again. He maintained that while at Crescent Beach, he retrieved a shovel from the Chrysler New Yorker and, after being startled by a noise in the woods, accidentally struck Kendra in the face with the shovel. As she lay on the ground bleeding, Tassone confessed to burying Kendra, realizing later that "she was still alive because her hands came up and out of the sand." Finally, the following morning—after sleeping, declining breakfast, and again waiving his constitutional rights—Tassone precisely described the clothes Kendra was wearing, the manner of death, and the burial site. The petitioner stated that Kendra was wearing a bright red dress, black shoes, and white nylons; that he had killed her with a shovel; and that he had formed a circle with sand surrounding her grave. Tassone further directed police to a small bridge on Route 195, where the murder weapon and blanket were located. Collectively, these details could only have been known by Kendra's killer.

Despite numerous inculpatory statements, including the multiple admissions that he and Kendra were together in the hours before her murder, petitioner reversed

- 25 -

course before the jury and denied that he was with Kendra on the evening she was killed. This testimony not only contradicted the second, third, and fourth statements, but also the independent evidence linking him to the crime scene. An expert witness testified for the prosecution that sand was discovered in the trunk and on the driver's floor of the Chrysler New Yorker and that the substance discovered was "characteristic" with the sand from Kendra's grave. A Misty's brand cigarette butt and a Dunkin' Donuts beverage cup containing partially consumed coffee was discovered at the crime scene, and a Misty's brand cigarette box and a Dunkin' Donuts napkin was found in the Chrysler New Yorker.

Tassone's self-serving testimony that he was not with Kendra on the fateful evening was also at odds with Christine Langlais's testimony that Kendra left work early on June 29, 1994, because she had a date; as well as the evidence that when she departed her home on June 29, 1994, at approximately 9 p.m., she provided Christopher with a card containing the name "Gary" and a telephone number. This contact information led directly to one person only, Tassone. Notably, petitioner's exculpatory denial also conflicted with his trial testimony that on the morning of July 2, 1994 (when he provided the fourth statement), he "was convinced I did the crime."

While the foregoing constituted overwhelming inculpatory evidence pointing directly at petitioner, Tassone's evolving version of events—and, most critically, his

inability to answer consistently the most basic question concerning whether he and Kendra were together in the hours preceding her murder—was damning. In this respect, we deem it appropriate to repeat the words pronounced by the trial justice at sentencing: "A jury decided that [Tassone] was not worthy of belief. The jury decided that he took the stand and he lied, and he had all the indicia of a liar." *Tassone I*, 749 A.2d at 1121. The petitioner cannot escape the vast evidence or credibility determinations. *See Rice*, 38 A.3d at 17 n.11 ("[O]n review of an application for post-conviction relief we are bound by the trial justice's determination concerning credibility.") (quoting *State v. Feng*, 421 A.2d 1258, 1273 (R.I. 1980)).

## B

### Tassone's Allegations of Prejudice

Notwithstanding the foregoing, Tassone insists that counsel's ineffective assistance prejudiced his right to a fair trial. He ignores critical evidence undermining his prejudice argument. For example, Tassone argues that he was prejudiced when counsel failed to cross-examine the detectives and/or retain an expert concerning the alteration of the time on the first rights form, which he admittedly signed at 8:50 p.m. The petitioner suffered no prejudice from the absence of such testimony, however, because Det. Clark testified that he adjusted the time

on the form due to "[t]he time that was put there was 0850, signifying 8:50 in the morning, as opposed to 20:50, 8:50 at night."

Tassone also argues that he was prejudiced when counsel failed to introduce into evidence a psychological assessment performed in 1983 when he was sixteen years old and in high school. (Petitioner was twenty-seven years old in 1994 when he provided the statements.) From this decade-old assessment, Tassone highlights various excerpts and (what he represents is a "low average") verbal IQ score of 86. In so doing, petitioner suggests that had this evaluation been introduced into evidence, it would have advanced his argument that he was affected by learning disabilities when he furnished the statements to Dets. Clark and Bilodeau and undermined the determination that the statements were provided knowingly and voluntarily. Thus, petitioner submits, the confessions would have been suppressed, or, at the very least, the reliability of the confessions diminished for the jury. We disagree.

In our opinion, Tassone sustained no prejudice from the omission of this high-school-era report in light of his testimony that he understood his constitutional rights and the trial justice's emphatic findings that petitioner knowingly, voluntarily, and intelligently waived them. *See supra*. Additionally, although the report references what petitioner characterizes as a "low average" verbal IQ score of 86, he ignores that the assessment also details a full-scale IQ score of 91 and a performance

IQ score of 98. All scores are at odds with petitioner's argument that he lacked the capacity to waive his constitutional rights knowingly and voluntarily.[8]

The petitioner's remaining efforts to demonstrate prejudice also fall woefully short. Tassone insists that he was prejudiced by counsel's failure to offer a third-party-perpetrator defense, but this Court has been steadfast that a defendant who wishes to mount such a defense must present a "reasonably specific" offer of proof that "must not only allude to the motive but must also point to 'evidence tending to show the third person's opportunity to commit the crime and a proximate connection between that person and the actual commission of the crime.'" *State v. Barros*, 24 A.3d 1158, 1184 (R.I. 2011) (quoting *State v. Gazerro*, 420 A.2d 816, 825 (R.I. 1980)). As an evidentiary matter, the second postconviction-relief trial justice concluded that the record was insufficient to present this defense and we concur with that determination.

The petitioner also directs our attention to counsel's failure to procure an investigator concerning the visibility of the willow tree near Route 195 on the late-June evening Kendra was murdered. Tassone admits, however, that he did not

---

[8] *See Burger v. Kemp*, 483 U.S. 776, 791 n.9 (1987) (noting psychologist's testimony that the petitioner's IQ score of 82 was not beyond the concept of understanding right from wrong); *United States v. Rosario-Diaz*, 202 F.3d 54, 69 (1st Cir. 2000) (concluding the district court did not clearly err in determining that waiver and consent were knowingly and voluntarily provided when the defendant's IQ score was in the mid-70s).

request that counsel retain an expert until after his trial commenced in January 1997. Without any support, Tassone suggests that if an investigator had been retained at the eleventh hour to evaluate the late-evening lighting conditions on June 29, 1994, near the Route 195 overpass, the investigator would have determined that he did not (and could not) identify the willow tree as a landmark where the shovel and blanket were discarded. We reject petitioner's assertion of prejudice from this speculative theory and note that Det. Bilodeau described for the jury the lighting conditions in the area of the willow tree. He explained that "*in the middle median lane, there are street lights*, but, off where the tree is, I do not see any street lights." (Emphasis added.) Likewise, in his fourth statement, petitioner similarly admitted, "I * * * stopped on 195 West *just before the bright lights on the state line*. I stopped and threw the blanket and the shovel off the side of the road." (Emphasis added.)

In a similar vein, Tassone maintains that he was prejudiced by counsel's failure to move to suppress blood evidence seized from him pursuant to a search warrant issued in accordance with G.L. 1956 § 12-5-2, which then provided authority "to search for and seize any *property* * * *."[9] (Emphasis added.) While

---

[9] The petitioner extensively argues that despite our holding in *State v. Dearmas*, 841 A.2d 659 (R.I. 2004), that, as a matter of first impression, blood seized pursuant to a search warrant issued in accordance with G.L. 1956 § 12-5-2 did not constitute "property," counsel should have construed the statute's plain language and pursued this novel argument at or before trial in 1997. *See Dearmas*, 841 A.2d at 663, 668. Our resolution renders discussion of this argument unnecessary.

- 30 -

Tassone argues that a forensic examination of his blood linked him to semen found on the blanket discovered off Route 195, we agree with the second postconviction-relief trial justice's determination that petitioner sustained no prejudice because, *inter alia*, he stipulated before the jury that the semen found on the blanket was his own. *See State v. Gomes*, 881 A.2d 97, 108 (R.I. 2005) (finding harmless error in admission of blood evidence in light of overwhelming and independent inculpatory evidence). As petitioner remarked during the postconviction-relief hearing, "the white blanket had my DNA on it, which of course it would."

Finally, Tassone argues that counsel neglected to test what he characterizes as sand depicted in a photograph of one of the Chrysler New Yorker's tires, but he acknowledged during the postconviction-relief hearing that the substance was never seized by the police. Because the substance had not been seized, the petitioner was not prejudiced by counsel's failure to test the substance.

## Conclusion

For the reasons stated, the judgment of the Superior Court is affirmed. The papers in this case are remanded to the Superior Court with our decision endorsed thereon.



## STATE OF RHODE ISLAND

## SUPREME COURT – CLERK'S OFFICE

Licht Judicial Complex
250 Benefit Street
Providence, RI  02903

## OPINION COVER SHEET

| | |
|---|---|
| **Title of Case** | Gary Tassone v. State of Rhode Island. |
| **Case Number** | No. 2021-314-M.P.<br>(PM 00-4624) |
| **Date Opinion Filed** | March 19, 2026 |
| **Justices** | Suttell, C.J., Goldberg, Robinson, Lynch Prata, and Long, JJ. |
| **Written By** | Associate Justice Maureen McKenna Goldberg |
| **Source of Appeal** | Providence County Superior Court |
| **Judicial Officer from Lower Court** | Associate Justice William E. Carnes, Jr. |
| **Attorney(s) on Appeal** | For Petitioner:<br><br>Kara J. Maguire<br>Rhode Island Public Defender |
| | For Respondent:<br><br>Virginia M. McGinn<br>Department of Attorney General |